(No. 79217.—

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. PERRY OLINGER, Appellant.

*Opinion filed April 17, 1997.—Rehearing denied June 2, 1997.*

Ronald D. Haze, of the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield,

and Gary L. Spencer, State's Attorney, of Morrison (Barbara A. Preiner, Solicitor General, and Arleen C. Anderson and Steven J. Zick, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE BILANDIC delivered the opinion of the court:

Following a jury trial in the circuit court of Whiteside County, the defendant, Perry Olinger, was found guilty of the murders of three individuals and sentenced to death. This court affirmed defendant's convictions and death sentence on direct appeal. *People v. Olinger*, 112 Ill. 2d 324 (1986). Defendant subsequently filed a second-amended petition for post-conviction relief, which the circuit court dismissed without conducting an evidentiary hearing. He appeals to this court from the dismissal of his post-conviction petition. 134 Ill. 2d R. 651(a).

## FACTS

During the morning of May 25, 1982, James Adams was found dead in his home in Rock Falls, Illinois. Later that same morning, Gordon Stevens and Debra Bushman were found dead in their home in nearby Sterling, Illinois. After a five-month investigation by various law enforcement agencies, defendant and a codefendant, William Duncan, were charged by indictment with the three homicides, and with armed robbery, armed violence and conspiracy. Defendant and Duncan were tried simultaneously before the same jury. The jury found them both guilty as charged. Defendant and Duncan each waived his right to a jury for sentencing. In separate sentencing hearings, the circuit court sentenced defendant to death and Duncan to life imprisonment.

This court ultimately reversed Duncan's convictions and remanded his case for a new trial, holding that Duncan's trial should have been severed from defendant's

trial. *People v. Duncan*, 124 Ill. 2d 400 (1988), *on remand from Illinois v. Duncan*, 484 U.S. 806, 98 L. Ed. 2d 18, 108 S. Ct. 53 (1987), *vacating People v. Duncan*, 115 Ill. 2d 429 (1987). As noted, this court affirmed defendant's convictions and sentence on direct appeal. This case is now before us following the circuit court's dismissal of defendant's post-conviction petition.

### Trial Evidence

The evidence presented at defendant's trial is detailed in this court's opinion on direct appeal. *People v. Olinger*, 112 Ill. 2d 324 (1986). The evidence showed that Tina Taber discovered the body of her boyfriend, James Adams, lying on his kitchen floor surrounded by a large pool of blood and blood spatters at approximately 10:15 a.m. on May 25, 1982. Taber also found Duncan asleep on a couch in the adjoining living room. Duncan did not respond when Taber called him, so Taber shook Duncan awake. Duncan did not appear to understand when Taber told him that Adams was hurt. Duncan was wearing the same clothes he had on the night before, and there was no blood on him. Taber and Duncan waited for the police to arrive. An autopsy revealed that Adams was the victim of a deep knife wound to his neck and five blows to the head. The weapon used to kill Adams was never recovered.

Duncan testified in his own defense that he had slept through the attack on Adams. He stated that he had drunk at least 10 beers between 5 p.m. on May 24 and 3:30 a.m. on May 25, had taken a substantial amount of cocaine and marijuana between midnight and 5:30 a.m. on May 25, had not slept for three days and had taken a sinequan capsule around 6 a.m. on May 25. He then fell asleep on the couch. The next thing he remembered was being awakened by Taber.

At approximately 11:30 a.m. on May 25, 1982, a friend of Debra Bushman discovered the body of Gor-

don Stevens in the house that he shared with Bushman. The friend found the front door ajar, although it customarily was kept locked. She entered, saw Stevens' body and called police. Upon arriving at the scene, the police discovered Debra Bushman's body lying in a hallway. There were no signs of forced entry into the house. Autopsies revealed that Stevens and Bushman each died from a single gunshot wound to the head, inflicted at close range with the same .22 Magnum pistol.

The State's evidence against defendant was as follows. It was undisputed that defendant knew victims Adams and Stevens. Defendant told police that his association with Adams and Stevens had been "like a triangle"; they each helped the others to sell drugs when they had some available.

With regard to the Adams homicide, the State presented evidence that Adams both used and sold drugs extensively. Early in the morning of May 24, 1982, Adams returned from a trip where he and the codefendant Duncan purchased a large quantity of drugs. Adams immediately placed several telephone calls informing potential buyers that he had cocaine for sale. Testimony of Adams' customers established that Adams sold cocaine beginning at 9 a.m. and continuing throughout the day on May 24. They reported seeing defendant at Adams' house, as well as several other people.

Defendant told police that he went to Adams' house three different times on May 24—specifically, from 10 to 11 a.m.; between 1 to 2 p.m.; and from 11:30 p.m. on May 24 until about 4:30 a.m. on May 25. Defendant stated that, during his second visit, he obtained some cocaine and used it. During his third visit, defendant obtained more cocaine from Adams on credit, giving Adams a high-powered rifle as collateral.

Other testimony established that, at about 1 a.m. in

the morning of May 25, Adams left his house and went to Randolph Stralow's house, taking his cocaine and money with him. Duncan, who was staying with Adams, remained at Adams' house, as did defendant and his girlfriend, Rhonda Odquist. Defendant and Duncan consumed cocaine there for several hours. During this time, Duncan called Adams at Stralow's house four times, asking him when he would return. According to Duncan and Odquist, defendant and Odquist left Adams' house at around 5 a.m. Stralow testified that Adams left Stralow's home with his cocaine and money at about 7 a.m. on May 25. An acquaintance of Adams testified that she saw Adams' van turning into his driveway at 7:15 a.m. on May 25. As stated, Adams' body was discovered at 10:15 a.m. on May 25. Defendant's palmprint was lifted from the stove in the kitchen where Adams' body was found.

The State also presented evidence that defendant, who was unemployed, had a large amount of cash after the murders. Patty Doyle testified that she saw defendant with a rolled-up "wad" of bills on the afternoon of May 25. She did not know how much money was there. A gas station attendant testified that defendant paid his bill with a single $100 bill one or two days after the murders. On June 3, four $100 bills were recovered from beneath the floor mat in defendant's pick-up truck.

Randolph Stralow testified that Adams left Stralow's home with his cocaine and $1,800 at about 7 a.m. Stralow stated that he knew the amount of money Adams had because he had watched him count it out in stacks of hundreds; Adams mostly had $20 bills, but he "could have" had some $10 and $100 bills. An investigation of the Adams crime scene on the morning of May 25 revealed no money or wallet on Adams or in his house. Tina Taber testified that, three or four days after finding Adams' body, she found Adams' cocaine hidden

in his garage. Patty Doyle testified that when she saw defendant one week after the murders, defendant told her that "Jim [Adams] said all the coke was left at [Stralow's]."

Defendant's mother testified for the defense that she co-signed a bank loan for defendant in the amount of $3,431, which proceeds he received in early May 1982.

With regard to the murders of Stevens and Bushman, the State presented evidence that defendant was seen talking to Stevens in a bar during the early evening hours of May 24, 1982. Dale Ulve testified that defendant and Stevens invited Ulve to stop by Stevens' house later that night, telling him that they would have cocaine available for him to use.

The .22 Magnum pistol used to kill Stevens and Bushman was never recovered; however, the State linked this weapon to the burglary of Dennis Burris' farmhouse on May 22, 1982. Burris testified that several firearms, including a .22 Magnum pistol, had been stolen from his farmhouse. Burris further related that, prior to the burglary, he had shot and killed a dog with the .22 Magnum pistol. The dog's body was exhumed and, according to the State's firearms expert, the bullets found in the dog were fired from the same gun as the bullets found in Stevens and Bushman.

Three men admitted their participation in the Burris burglary—defendant, Darrell Onken and Edward Stalder. Defendant's admission to his participation in the burglary was presented to the jury through the testimony of the law enforcement officials to whom he gave his statement.

Darrell Onken testified for the State regarding the Burris burglary. Onken stated that, during the afternoon of May 22, he was drinking at a local tavern. Defendant introduced him to "Mike," whose real name, Onken later learned, was Edward Stalder. Defendant mentioned

that he had no money. The three men decided to commit a burglary. Ultimately, they drove to the Burris residence, where Onken acted as a lookout while Stalder and defendant went into the house. Stalder and defendant returned with a burlap sack. Onken did not see what was in the sack, did not receive any proceeds from the burglary and did not know what, if anything, the other two participants received.

Defense witnesses testified regarding activity that they observed at the Stevens/Bushman residence on the morning of May 25. A neighbor who lived across the street from Stevens and Bushman testified that he saw a man drive up to the Stevens house and walk to the door at approximately 9:15 a.m. He watched the man enter the house, but did not notice him leave. This man had dark hair and was driving a fairly new, light-colored car. Another neighbor who lived across the street related that he saw a car pull into the driveway of the Stevens house at about 9:30 a.m. He saw a man get out of the car and run toward the house. This man had light-brown, shoulder-length hair and the car was dark green. The neighbors' descriptions do not fit defendant, who had red hair and drove a pick-up truck.

The most significant evidence offered by the State to connect defendant to the three murders was the testimony of Edward Stalder. Because Stalder's testimony is central to the first claim addressed on appeal, we present that testimony in detail. Stalder testified that, in April of 1982, he left his home in another state and moved into his friend William Mooney's house in Whiteside County, Illinois. A man named Kevin Anderson and Mooney's wife were also living there at the time.

Stalder met defendant for the first time on May 15, when defendant visited the Mooney house. Stalder had some cocaine in his possession, which he shared with defendant. Stalder explained that he generally consumed

his cocaine by shooting it up with a needle. Later that night, Stalder and defendant discovered that they were out of needles. In a search for needles, Stalder and defendant drove to Adams' house in Rock Falls. They were directed to the Stevens/Bushman residence in Sterling. There, Stalder met Stevens and Bushman for the first time, and then all four shared Stalder's cocaine. Defendant ultimately dropped Stalder off at the Mooney house the next evening, May 16.

Stalder did not see defendant again until he met him in a tavern in Morrison, Illinois, during the afternoon of May 22. There, Stalder was introduced to Onken. Stalder, defendant and Onken talked about "everybody being short on money and figuring out some way to get some." According to Stalder, while he and defendant were alone, defendant asked Stalder to join him in "taking over control of the drug traffic in the area." Defendant suggested that he and Stalder steal drugs from "Jim Adams and a Bill" and "make sure there wasn't [sic] any witnesses left." Stalder understood "Bill" to be William Duncan. Stalder stated that he declined this offer.

Stalder, defendant and Onken proceeded to the Burris farmhouse. Stalder and defendant burglarized the farmhouse while Onken stood watch outside. Stalder stated that they stole several firearms including a .22 Magnum pistol, a .38-caliber pistol and two black-powder pistols. Stalder claimed that he took the .38 and the two black-powder pistols, but that defendant kept the .22 Magnum. As stated above, this .22 Magnum pistol was later determined to be the weapon used to kill Stevens and Bushman.

Stalder further testified that, later during the night, after Onken was gone, defendant again tried to convince him to "go in with him on taking over the drug traffic." Stalder again told defendant that he was not interested.

Stalder next related that after defendant dropped him off at the Mooney house on the evening of May 23, he remained there until May 25. Stalder stated that he heard about the murders and, two or three days later, he moved into Bob Edmunds' home in Morrison. He and Edmunds traveled to Iowa, where Stalder gave the two black-powder pistols to a person with instructions to sell them or dispose of them. They then returned to Morrison. On June 8 or 9, 1982, Stalder and Edmunds again traveled to Iowa along with Bill Mooney and others. The group was pulled over outside of Newton, Iowa, for a traffic offense. Stalder was arrested for possession of a weapon. Stalder testified that he was carrying "a .38" and "a .45 with filed serial numbers" at the time of his arrest.

Stalder acknowledged that he had been convicted of a federal weapons charge and was presently in federal custody. Stalder also stated that he was given immunity for burglarizing the Burris residence in exchange for his testimony.

On cross-examination, Stalder was asked if he had ever previously been convicted of any crimes. Stalder testified that he had been convicted of burglary and drug offenses in Florida and of a drug offense in Nebraska. He also stated that he had been charged in Iowa for weapons and drug offenses, and that the charges had been dropped. Stalder further stated that he had been charged with a parole violation in Florida, which had been dropped because he was doing five years in federal custody.

The jury found both defendant and Duncan guilty of the three murders and related charges. Separate sentencing proceedings commenced. Defendant waived his right to a jury for sentencing. The circuit court determined that defendant was eligible for the death penalty and, after considering evidence in aggravation and mitigation, sentenced him to death.

Post-Conviction Proceedings

Defendant's second-amended post-conviction petition, with accompanying exhibits, was filed on August 19, 1994. The State filed a motion to dismiss the petition. After briefing and argument, the circuit court granted the State's motion to dismiss with respect to all claims of the post-conviction petition, except one. The post-conviction petition alleged that a juror named Myrna Brown had written a letter to a local newspaper several years after defendant's conviction in which she espoused the view that criminal defendants should be presumed guilty until they prove themselves innocent. The circuit court allowed a discovery deposition to be taken of juror Brown to determine whether, at the time of defendant's trial, she followed her oath as a juror. Following this deposition, the circuit court ruled that juror Brown had done so. The court therefore dismissed this last claim of the post-conviction petition.

Defendant also filed several discovery motions in the circuit court during the course of post-conviction proceedings. The circuit court denied all these requests.

Defendant's post-conviction petition identifies additional evidence, which was not presented at his trial. This evidence is discussed in the analysis portion of the opinion.

## ANALYSIS

We initially note the proper scope of our review. Defendant's petition for post-conviction relief was filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122—1 *et seq.* (West 1994)). To obtain relief under the Act's provisions, a defendant must establish that a substantial deprivation of his constitutional rights occurred in his trial or sentencing hearing. 725 ILCS 5/122—1 (West 1994).

A defendant is not entitled to an evidentiary hearing on a post-conviction petition as a matter of right;

rather, an evidentiary hearing is required only when the allegations of the petition, supported by the record or accompanying affidavits, make a substantial showing of a violation of a constitutional right. *People v. Del Vecchio*, 129 Ill. 2d 265, 279 (1989). For the purpose of determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and any accompanying affidavits are taken as true. *People v. Brisbon*, 164 Ill. 2d 236, 245 (1995).

With some very narrow exceptions, the judgment of the reviewing court on a previous appeal is *res judicata* as to all issues actually decided, and any issue that could have been presented, but was not, is waived. *People v. Ruiz*, 132 Ill. 2d 1, 9 (1989).

### I. State's Knowing Use of Perjured Testimony and Related Claim

Defendant contends that his constitutional right to due process of law was violated at his jury trial because the State elicited false testimony from Edward Stalder regarding promises made to him in return for his testimony against defendant. Specifically, defendant claims that Stalder was permitted to testify that he was given immunity only from prosecution for the Burris burglary in exchange for his testimony, when in fact Stalder obtained a multijurisdictional deal, which included the dismissal of a number of other charges pending against him. Defendant attached items to his post-conviction petition which, he argues, demonstrate that Stalder testified falsely regarding the extent of the consideration he received in exchange for his testimony.

The first item attached to defendant's post-conviction petition is the signed affidavit of Nick Critelli, an attorney who represented Stalder. This affidavit, dated August 14, 1994, states in relevant part:

"I am Nick Critelli, an attorney at law having been admitted to practice in the State of Iowa and the State of New York. ***

On or about the 8th day of July, 1982 I was appointed by the United States District Court for the Southern District of Iowa to represent one Edward Stalder, an individual who was to plead to an indictment charging a violation of 18 USC 922(k) and 924(a) and 18 USC app. 1202(a)(1) before that Court.

During the representation, I and my associate Mr. James Sherburne were informed by the United States District Attorney assigned to the case, Mr. Joe Beck that Mr. Stalder was a suspect in a burglary in Illinois and had information that would assist the Illinois authorities in a homicide investigation. Mr. Stalder had previously talked with the Illinois authorities but had not at that point reached an agreement with them regarding his testimony. *Mr. Beck and I discussed the matter and reached an understanding that if Mr. Stalder cooperated with the Illinois authorities, he would receive favorable treatment in the pending federal case.* I do not recall how we received the name of the Illinois State's Attorney, Mr. Gary Spencer, if I called Mr. Spencer first or if he called us, however we did make contact and began negotiations. *Our plan was that in exchange for testimony in the homicide case, Mr. Stalder would receive absolute immunity on the Illinois burglary from Mr. Spencer, Mr. Beck would accept a plea to one count of the federal indictment and dismiss the other, and Florida and Nebraska would dismiss their pending actions against Mr. Stalder. Because of the seriousness of the homicide case and the materiality of Mr. Stalder's anticipated testimony, the various prosecuting authorities were understandably co-operative.* Florida and Nebraska were not interested in continuing their matters as long as Mr. Stalder was doing federal time on the federal charge. *We were able to work out a global settlement of all pending charges against Mr. Stalder."* (Emphasis added.)

The affidavit further relates that the State's Attorney of Whiteside County traveled to Des Moines, Iowa, and on July 16, 1982, he signed a written agreement with Stalder, giving Stalder immunity for the Burris burglary in exchange for his cooperation. The affidavit also states that on July 29, 1982, Stalder entered into a plea

agreement with the federal government in which he pled guilty to one count of the federal indictment against him and in exchange the second count of the indictment was dismissed. Subsequently, authorities in Florida and Nebraska dismissed their charges against Stalder as well.

A second item attached to defendant's post-conviction petition is an investigative report kept by the Illinois Department of Law Enforcement. According to this report, the State's investigation into the homicides was ongoing when Stalder was arrested in Newton, Iowa, in early June of 1982. The report indicates that one of the weapons that had been stolen from the Burris farmhouse was found in Stalder's possession. At that time, a separate weapon taken in the Burris burglary was suspected of being used to murder Stevens and Bushman. The report states that, on June 27, 1982, Illinois authorities traveled to Iowa and met with Stalder and his attorney at the police station, where they interviewed Stalder concerning the Burris burglary and the homicides. Stalder's attorney told authorities that his client had important information about some homicides and would cooperate with them if they would grant, in writing, to Stalder the following:

"1. Dismissal of possible burglary warrant in Illinois (Burris burglary)

2. Dismissal of Iowa (Newton P.D.) gun charges (see separate report)

    a. Possession of concealed weapon, 2 counts

    b. Operating motorcycle without license

    c. No lights on cycle

    d. Possibly other drug charges (hashish oil)

3. Federal charges (ATF)

    a. Possession of a firearm after being a convicted felon

    b. Interstate transport of a weapon with serial number removed (Stalder states he was possibly going to cooperate with federal officers anyway

for consideration on these charges, on a separate, non-connecting incident. He, Stalder, would do this on a package deal)

    4. Release from probation from Florida (20 years) through Nebraska control[.]"

The report concludes with the statement that police authorities informed Stalder and his attorney that they would contact the appropriate "police, probation, prosecuting, and federal agencies to see what, if anything, could be worked out."

The rule is well-established that the State's knowing use of perjured testimony to obtain a criminal conviction constitutes a violation of due process of law. *People v. Jimerson*, 166 Ill. 2d 211, 223 (1995). A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. *United States v. Bagley*, 473 U.S. 667, 678-80, 87 L. Ed. 2d 481, 492, 105 S. Ct. 3375, 3381-82 (1985).

These same principles obtain where the State, although not soliciting the false testimony, allows it to go uncorrected when it appears. *Napue v. Illinois*, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959); *People v. McKinney*, 31 Ill. 2d 246, 251 (1964). It is equally well established that the above principles apply even where the witness' false testimony goes only to that witness' credibility. *Napue*, 360 U.S. at 269, 3 L. Ed. 2d at 1221, 79 S. Ct. at 1177. This is because the "jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue*, 360 U.S. at 269, 3 L. Ed. 2d at 1221, 79 S. Ct. at 1177.

Applying these principles here, we conclude that defendant is entitled to an evidentiary hearing on this claim. Defendant charges that the State elicited testi-

mony from Stalder that he was only given immunity from prosecution for the Burris burglary in exchange for his testimony, when in fact the State knew that Stalder had obtained a multijurisdictional deal which included the dismissal of a number of other charges pending against him. Defendant asserts that, despite this knowledge, the State allowed Stalder's false testimony to go uncorrected, in violation of his right to due process.

This claim is supported by the record. The record of defendant's jury trial discloses that Stalder testified that the *only* promise made to him in exchange for his testimony against defendant was that he was given immunity for burglarizing the Burris residence. The following colloquy occurred at the conclusion of Stalder's direct examination:

"[Q.] *** Mr. Stalder, I would like to know whether or not on occasions prior to your appearance in Court today you have discussed the same subject matter that you have testified about today with members of the law enforcement community?

A. Yes, I have.

Q. Specifically, I'd like to know whether or not you have discussed the nature and the subject matter of your testimony today with the State's Attorney of Whiteside County, a gentleman named Gary Spencer?

A. Yes, I have.

Q. And is it true, sir, that as a result of your discussions with him that an agreement has been reached between yourself and Mr. Spencer in his role as State's Attorney?

A. Yes, there was.

Q. I would like you to indicate for the ladies and gentlemen what your understanding is of the agreement that exists? [*sic*]

A. *The only agreement that exists is that the charges, as far as the burglary at the Burris residence are concerned, are to be dropped. That's the only agreement.*

THE COURT: Against this witness?

A. Against me. That's right, sir.

Q. And in return for the dropping of the charges, were you informed as to what would be expected of you?

A. I was to give a true and factual statement and testimony, if necessary—be against any persons that I knew that might have had any connection with that same burglary and their conversations or whatever." (Emphasis added.)

This was the full extent of Stalder's testimony concerning the consideration he obtained as a result of his cooperation with Illinois authorities. We find that a fair appraisal of this record requires the conclusion that Stalder framed his testimony in such terms as to impart to the jury the message that *the only consideration he received for testifying was immunity from the Burris burglary.* Once Stalder framed his testimony in this manner, the State was under an obligation to correct any falsity. This case is therefore distinguishable from *People v. Pecoraro*, 175 Ill. 2d 294, 312-14 (1997), where we explained that the State has an obligation to correct false testimony, not an obligation "in the first instance to impeach its own witnesses with all evidence bearing on their credibility."

In contrast to Stalder's trial testimony, the affidavit of Stalder's attorney, which we must accept as true for purposes of deciding whether to grant an evidentiary hearing (*Brisbon*, 164 Ill. 2d at 245), unambiguously declares that Stalder obtained a multijurisdictional deal as a direct result of his cooperation with Illinois authorities concerning this case. The affidavit of Stalder's attorney states that he reached an understanding with a United States District Attorney "that if Mr. Stalder cooperated with the Illinois authorities, he would receive favorable treatment in [his] pending federal case." Stalder's attorney further averred that he negotiated with the State's Attorney of Whiteside County on Stalder's behalf. The affidavit next states: "Our plan

was *that in exchange for testimony in the homicide case,* Mr. Stalder would receive absolute immunity on the Illinois burglary from [the State's Attorney of Whiteside County], [the United States District Attorney] would accept a plea to one count of the federal indictment and dismiss the other, and Florida and Nebraska would dismiss their pending actions against Mr. Stalder. *Because of the seriousness of the homicide case and the materiality of Mr. Stalder's anticipated testimony, the various prosecuting authorities were understandably cooperative. \*\*\* We were able to work out a global settlement of all pending charges against Mr. Stalder."* (Emphasis added.) We conclude that the attorney's affidavit makes a substantial showing that Stalder did in fact receive a multijurisdictional deal in exchange for his testimony implicating defendant in the homicides and that Stalder therefore committed perjury when he testified to the contrary.

In addition, we are persuaded that defendant has also made a substantial showing that Illinois authorities knew of this multijurisdictional deal, but nonetheless allowed Stalder's false testimony to go uncorrected. In order to establish a violation of due process, the prosecutor actually trying the case need not have known that the testimony was false; rather, knowledge on the part of any representative or agent of the prosecution is enough. *People v. Brown*, 169 Ill. 2d 94, 103 (1995) (and cases cited therein); accord *Giglio v. United States*, 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972). Here, Stalder's attorney's affidavit states that he was in contact with the State's Attorney of Whiteside County regarding his negotiation of Stalder's multijurisdictional deal, and that the State's Attorney of Whiteside County then traveled to Des Moines, Iowa, and consummated his part of the deal on July 16, 1982. The attorney's affidavit is bolstered by the investigative report kept by the

Illinois Department of Law Enforcement, also attached to defendant's post-conviction petition. This report indicates that Illinois authorities had knowledge that Stalder was facing charges in several different jurisdictions and was willing to cooperate with Illinois authorities regarding their homicide investigation in exchange for "a package deal." This report concludes with the statement that Illinois and other police authorities told Stalder they would contact the prosecuting agencies to see what could be worked out. We conclude that the affidavit sufficiently indicates that the prosecutor's office had knowledge that Stalder received a multijurisdictional deal. Defendant is therefore entitled to an evidentiary hearing on this claim.

The State responds that any failure on its part to correct Stalder's testimony constitutes harmless error. According to the State, evidence of a multijurisdictional deal would have been "merely cumulative" because the jury was informed that Stalder had received immunity from prosecution for the Burris burglary and that he had been charged with numerous crimes in the past. The State thus maintains that defendant is not entitled to an evidentiary hearing because Stalder's "lack of credibility and potential motive to fabricate" were already conveyed to the jury.

A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. *Bagley*, 473 U.S. at 678-80, 87 L. Ed. 2d at 492, 105 S. Ct. at 3381-82. This standard is equivalent to the harmless error standard recently applied by this court in *People v. McNeal*, 175 Ill. 2d 335, 354-55 (1997), and *People v. Jimerson*, 166 Ill. 2d 211, 228-29 (1995). See *Bagley*, 473 U.S. at 679 n.9, 87 L. Ed. 2d at 492 n.9, 105 S. Ct. at 3382 n.9. In considering the particular facts and circumstances of this case, we are not

able to conclude that evidence that Stalder obtained a multijurisdictional deal in exchange for his testimony against defendant would not have affected the jury's verdict. Such information would show that Stalder had a powerful motive to testify falsely—*i.e.*, his own self-interest in obtaining the dismissal of several charges pending against him in a number of jurisdictions. Had the jury been informed of such information, it may well have concluded that Stalder was unworthy of belief because he had an overwhelming incentive to fabricate testimony.

More importantly, the testimony of Edward Stalder was critical to the State's case against defendant. The State's evidence traced the Stevens and Bushman murder weapon to the Burris burglary. Three men admitted their participation in this burglary—defendant, Onken and Stalder. However, Stalder's testimony was the *only* evidence placing the murder weapon in defendant's hands. In addition, Stalder provided the *only* evidence which attributed a motive to defendant for the killings. Stalder claimed that defendant had attempted to recruit him in a plan to take over the local drug business by stealing drugs from the victim Adams and the codefendant Duncan, and leave no witnesses. Maintaining Stalder's credibility was therefore crucial to the State's case against defendant. Accordingly, our evaluation of the record as a whole compels us to conclude that any error in this regard may not be considered harmless. The fact that the jury was apprised of Stalder's immunity for the Burris burglary and his criminal convictions does not alter our conclusion. This information did inform the jury that Stalder had some motive to testify falsely. Nonetheless, the motive of which the jury was informed pales in comparison to the motive Stalder actually had if he indeed received the multijurisdictional deal attested to in his counsel's affi-

davit. See *People v. Sawyer*, 48 Ill. 2d 127 (1971) (evidentiary hearing ordered where prosecutor failed to disclose prior narcotics conviction of State's star witness).

The State also argues that we should find this issue waived because it could have been raised on direct appeal. We do not agree that waiver is appropriate here. Initially, we note that neither the attorney's affidavit on which defendant relies nor the investigative report was made part of the record on direct appeal. Also, the record of defendant's trial leaves no doubt that the jury was under the impression that the only deal received by Stalder for his testimony was immunity for the Burris burglary. Under these circumstances, we find that principles of fundamental fairness are implicated and require a relaxation of the strict waiver rule. See *Jimerson*, 166 Ill. 2d at 230 (similarly declining to apply the waiver rule); *People v. Cihlar*, 111 Ill. 2d 212, 218 (1986) (same).

In a related argument, defendant submits that the State, at defendant's trial, failed to turn over to the defense all evidence material to Stalder's impeachment as required by *Giglio v. United States*, 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972), and *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). These decisions establish that a defendant is deprived of his constitutional right to due process of law where the prosecution fails to turn over material impeachment evidence to the defense. See *United States v. Bagley*, 473 U.S. 667, 676, 87 L. Ed. 2d 481, 490, 105 S. Ct. 3375, 3380 (1985). Evidence is material in this context "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 87 L. Ed. 2d at 494, 105 S. Ct. at 3383. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 87

L. Ed. 2d at 494, 105 S. Ct. at 3383. We find that this issue is so closely tied to the issue discussed above, regarding the prosecutor's failure to correct Stalder's allegedly perjurious testimony, that it too should be considered at the evidentiary hearing to be held on whether Stalder received a multijurisdictional deal. Without an evidentiary hearing, we cannot determine whether defendant's constitutional right to due process of law has been violated.

## II. Juror Bias

Defendant next asserts that his constitutional right to an impartial jury was violated because a juror at his trial, Myrna Brown, was biased in favor of conviction and was not able to render a fair and impartial verdict. He argues that he is entitled to a new trial or an evidentiary hearing as a result. In support of this contention, defendant attaches two items to his post-conviction petition which, he maintains, demonstrate that the juror deliberately concealed her true feelings concerning the presumption of innocence in criminal cases during *voir dire*.

During *voir dire* examination before defendant's jury trial in 1983, juror Brown asserted several times that she understood the presumption of innocence, that she would require the State to prove defendant guilty beyond a reasonable doubt and that she could render a fair and impartial verdict. Also, the following colloquy took place between defendant's trial counsel and the juror:

"Q. And, would you expect Perry to prove himself innocent?

A. That's your job.

Q. No. Do you expect me to prove Perry innocent?

A. If he is, you will.

Q. Well, do you think Perry has a burden, any burden of proof?

A. No. All he has to do is tell the truth.

Q. If the defendant doesn't take the stand, will you hold that against him?

A. No. That's his right."

The first item attached to defendant's post-conviction petition is a letter that the juror wrote to the editor of a local newspaper in 1989, nearly six years after defendant's trial. The letter stated in pertinent part:

"A person accused of a crime is 'innocent until proven guilty.' I think this should be changed to read 'guilty until proven innocent.' The lawyers would have a lot more work to do and this should be proven so there was absolutely no doubt about the person's innocence."

The second item is an affidavit, allegedly signed by juror Brown in 1991. The affidavit states that, at the time of defendant's trial, Brown believed that "a person accused of a crime should be considered guilty until proven innocent" and that "the defendant Perry Olinger should have proven that he did not commit the crimes of which he was accused." These items do not entitle defendant to a new trial or an evidentiary hearing, for the reasons set forth below.

Both the United States and Illinois Constitutions guarantee an accused a jury that is impartial (*People v. Henderson*, 142 Ill. 2d 258, 291-92 (1990); *People v. Holman*, 132 Ill. 2d 128, 157 (1989); see *People v. Leger*, 149 Ill. 2d 355, 385 (1992)), which means "a jury capable and willing to decide the case solely on the evidence before it" (*Smith v. Phillips*, 455 U.S. 209, 217, 71 L. Ed. 2d 78, 86, 102 S. Ct. 940, 946 (1982)). This court in *Pekelder v. Edgewater Automotive Co.*, 68 Ill. 2d 136 (1977), promulgated a two-part standard to be applied in determining whether a defendant is entitled to a new trial due to false statements made by jurors during *voir dire* examination. A new trial is required if the movant establishes that (1) a juror answered falsely on *voir dire* and (2) prejudice resulted therefrom. *Pekelder*, 68 Ill. 2d at 139; see *People v. Porter*, 111 Ill. 2d 386, 403 (1986) (same test

applies in criminal cases); *cf. McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556, 78 L. Ed. 2d 663, 671, 104 S. Ct. 845, 850 (1984) (similarly holding that, to obtain a new trial, a party must demonstrate that "a juror failed to answer honestly a material question on *voir dire*" and that "a correct response would have provided a valid basis for a challenge for cause"); *State v. Messelt*, 185 Wis. 2d 255, 269, 518 N.W.2d 232, 238 (1994). This test is an exception to the general rule that jurors may not impeach their own verdict. *Department of Public Works & Buildings v. Christensen*, 25 Ill. 2d 273, 279 (1962); see *Gacy v. Welborn*, 994 F.2d 305, 313 (7th Cir. 1993).

Defendant has failed to establish both parts of the test. Defendant claims that the letter and affidavit reveal that the juror lied on *voir dire* regarding the presumption of innocence. We do not agree. On *voir dire*, the juror stated that she understood the presumption of innocence, that she would require the State to prove defendant guilty beyond a reasonable doubt and that she could render a fair and impartial verdict. The letter and affidavit, on the other hand, merely set forth the juror's personal opinions on how the criminal justice system could be improved. The letter states that the presumption of innocence "should be" changed, while the affidavit states that defendant "should have" proven that he did not commit the crimes of which he was accused. These viewpoints, expressed several years after the defendant's trial, do not demonstrate any falsity in the juror's *voir dire* testimony. Notably, the juror never asserts that she applied her viewpoints in defendant's case. Nor does she state that she did not understand the presumption of innocence, that she did not require the State to prove defendant guilty beyond a reasonable doubt or that she was not able to render a fair and impartial verdict. Consequently, defendant has failed to

demonstrate that the juror lied during her *voir dire* examination. Having failed to establish that the juror answered falsely on *voir dire*, defendant cannot establish the second part of the test, that prejudice resulted to him from a falsity. Defendant is therefore not entitled to a new trial or an evidentiary hearing on this claim.

We note, moreover, that a discovery deposition of juror Brown buttresses our denial of this claim. The circuit court ordered that Brown's discovery deposition be taken to determine whether, at the time of defendant's trial, she followed her oath as a juror. Both counsel for defendant and the State fully participated. At the deposition, Brown testified that she wrote her letter to the editor solely in reaction to another letter printed in the newspaper a short time before. She never connected defendant's trial with the letter, as the trial had occurred many years earlier. When questioned regarding her views at the time of defendant's trial, Brown stated that she had no trouble with the principles that the burden of proof is "purely upon the prosecution" and that defendant was considered "innocent until proven guilty." As to the affidavit attached to defendant's post-conviction petition, Brown testified that she was not familiar with it and did not sign it. Following this deposition, the circuit court ruled that both Brown's *voir dire* testimony and her deposition revealed that she had afforded defendant his presumption of innocence and had placed the burden of proof on the State. The circuit court therefore dismissed defendant's claim of juror bias. The circuit court's ruling is supported by the record. For the reasons stated, we likewise conclude that defendant is not entitled to post-conviction relief on this ground.

### III. Ineffective Assistance of Counsel

Defendant raises several claims of ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S.

356

668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), established a stringent, two-prong standard for evaluating such claims. A defendant must first demonstrate that his defense counsel's performance was deficient, in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2063. As to this prong, a defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence. *People v. Barrow*, 133 Ill. 2d 226, 247 (1989). Secondly, a defendant must demonstrate that, but for defense counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Both prongs of the *Strickland* test must be satisfied before a defendant can prevail on a claim of ineffective assistance of counsel.

A. *Failure to Call Codefendant Duncan to Testify*

Defendant initially contends that his trial counsel was ineffective for failing to call codefendant Duncan to testify or to cross-examine him when he testified in his own defense. Defendant points to two areas of inquiry which, he maintains, should have been brought before the jury. Both were statements contained in discovery materials tendered to defense counsel before trial, but were not made part of the record on direct appeal. Defendant argues that the admission of these statements into evidence through Duncan's testimony would have buttressed his defense and undercut the testimony of the State's witnesses.

The first statement was contained in an application for an eavesdropping device tendered to the circuit court on May 26, 1982, by a State's Attorney and a detective. The application recited that police had spoken with Dun-

can regarding a telephone conversation he claimed to have had with Kevin Anderson the day before the murders. According to the application, Duncan stated to police that Anderson had a drug dispute with both victims Adams and Stevens. Moreover, Anderson told Duncan that Anderson had a person "there with him for the purpose of hurting people" and that Anderson and "the unnamed person were coming to Adams' house the next day in the morning to straighten the situation out."

Anderson's purported statement to Duncan is hearsay. Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and it is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule. *People v. Lawler*, 142 Ill. 2d 548, 557 (1991).

Defendant submits that Anderson's statement was admissible as substantive evidence under the statement-against-penal-interest exception to the hearsay rule, citing *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), and its progeny. These decisions establish that an out-of-court declaration against the declarant's penal interest that the declarant committed the crime, and not the defendant on trial, may be admitted where justice requires and where there are sufficient indicia of trustworthiness of such statement. *People v. Bowel*, 111 Ill. 2d 58, 66 (1986) (and the cases cited therein). The *Chambers* Court considered four factors in making this determination: (1) whether the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) whether the statement was corroborated by other evidence; (3) whether the statement was self-incriminating and against the declarant's interest; and (4) whether there was adequate opportunity for cross-examination of the declarant. *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93

S. Ct. at 1048-49. These factors are merely guidelines, however, and admissibility ultimately depends on whether the statement was made under circumstances that provide considerable assurance of its reliability by objective indicia of trustworthiness. *Pecoraro*, 175 Ill. 2d at 307.

The statement at issue here was not made under circumstances providing a sufficient indicia of its trustworthiness. The only factor of the *Chambers* test met was that the statement tended to incriminate Anderson. None of the other factors were met. First, the statement was not made to a close acquaintance shortly after the crime occurred. Not only does the record fail to reveal the relationship between Duncan and Anderson, but Anderson allegedly made this statement to Duncan *before* the homicides. Neither was the statement corroborated by other evidence. Defendant submits that the following evidence at his trial is corroborating: that Edward Stalder moved in with Kevin Anderson and Bill Mooney in April of 1982, and that Stalder had a history of criminal conduct and drug-related activity. Defendant is suggesting that Stalder was the "unnamed" person referred to in Anderson's statement. We are compelled to point out that there is nothing in Anderson's statement regarding the identity of the unnamed person. Without more, we may just as easily assume that the unnamed person was defendant. We thus find that the second factor was not met. The fourth factor, whether there was adequate opportunity to cross-examine the declarant, was also not met. Here, there was no opportunity to cross-examine Anderson because he was not called as a witness in defendant's case.

Defendant has not presented any other indicia of reliability to support the admissibility of Anderson's statement. We conclude that Anderson's statement is not rendered admissible by the presence of the third

factor alone. See *People v. Keene*, 169 Ill. 2d 1, 29-30 (1995) (sole presence of this factor did not render statement admissible). Therefore, the statement does not qualify to be admitted as substantive evidence under this exception to the hearsay rule.

Defendant also argues that Anderson's statement was substantively admissible under two other exceptions to the hearsay rule. He asserts that the statement was admissible to show that Anderson acted in conformance with his statement, citing *People v. Grabbe*, 148 Ill. App. 3d 678, 688-89 (1986), and *People v. Reddock*, 13 Ill. App. 3d 296, 303-05 (1973). *Grabbe* and *Reddock* are distinguishable. The hearsay statements involved in those cases were made by homicide *victims* to show that they acted in conformance with their stated intent. Defendant has cited no case where this exception was applied in the manner he is suggesting, and we are aware of none. We therefore conclude that this exception is not applicable here.

Defendant last submits that Anderson's statement was admissible under the residual exception to the hearsay rule contained in Rule 804(b)(5) of the Federal Rules of Evidence (Fed. R. Evid. 804(b)(5)). This court has specifically declined to adopt this exception. *People v. Redd*, 135 Ill. 2d 252, 313 (1990). Consequently, this exception is not applicable in defendant's case.

In conclusion, Anderson's statement was not substantively admissible at defendant's trial under any exception to the hearsay rule. As a result, defendant's trial counsel would not have been able to admit this statement through the testimony of Duncan. This claim of ineffective assistance of counsel therefore fails because defendant has shown no deficiency in his counsel's performance.

We note, moreover, that we agree with the State that there is no guarantee that Duncan would have

relayed Anderson's statement on the witness stand. But even if Duncan had done so, the jury was not likely to have given it much weight. Duncan was a codefendant at defendant's trial. Duncan gave this statement to police a short time after the murders. The jury could well have concluded that Duncan was implicating Anderson at that time in an attempt to deflect suspicion from himself.

The second statement referred to by defendant was contained in a police report. The report recited that Merle Merkle told police that Duncan told her that he saw a glimpse of the killer as he walked out the door and that this person was not at Adams' house when Merkle was there. Defendant claims his trial counsel should have questioned Duncan on whether he made this statement.

Defendant has not shown that he was prejudiced by his counsel's failure to question Duncan regarding this alleged statement. The statement at issue amounts to a prior inconsistent statement by Duncan. A prior inconsistent statement is admissible solely for impeachment purposes; it is not admissible as substantive evidence of the truth of the matter asserted. *People v. Bryant*, 94 Ill. 2d 514, 522 (1983). At best, then, this prior inconsistent statement by Duncan could have been used to impeach Duncan's trial testimony that he slept through Adams' slaying. This impeachment of Duncan would not have benefitted defendant. To the contrary, impeachment of Duncan on this basis would have lent support to the State's theory that defendant and Duncan conspired together at Adams' house to murder Adams. Therefore, this claim of ineffective assistance of counsel was properly dismissed for failure to meet the prejudice prong of *Strickland*.

B. *Failure to Investigate and Impeach Edward Stalder*
Defendant contends that his trial counsel was inef-

fective because he failed to properly cross-examine Edward Stalder regarding possible deals given him in return for his testimony. This claim is related to the first issue addressed in this opinion, namely, whether the prosecution failed to correct Stalder's allegedly perjurious testimony regarding the consideration he obtained for testifying. Defendant points to the affidavit of Stalder's attorney and to the investigative report kept by the Illinois Department of Law Enforcement, both discussed in detail above, and asserts that these materials demonstrate that his trial counsel made no effort to adequately investigate or review these matters, or to use this information to impeach Stalder. He argues that he is entitled to a new trial or an evidentiary hearing on this claim.

We do not agree with defendant that his trial counsel's performance in this regard was so deficient that he "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. A review of the record reveals that, on December 17, 1982, prior to defendant's trial, his trial counsel filed a discovery motion "for disclosure of impeaching information" of the State's witnesses. Therein, he requested that the State disclose, *inter alia,* all information regarding the following:

"Any and all consideration or promises of consideration given to or on behalf of the witness or expected or hoped for by the witness. By 'consideration' defendant refers to absolutely anything, whether bargained for or not, which arguably could be of value or use to a witness ***, including but not limited to *** leniency, favorable treatment or recommendations or other assistance with respect to any pending or potential criminal, parole, probation, pardon *** or other dispute with [the] People or with any other authority ***; and anything else which arguably could reveal an interest, motive or bias in the witness in favor

> of the People or against the defense or act as an inducement to testify or to color testimony."

Counsel supported this request with a 17-page memorandum of law. The record further reveals that the trial court allowed this discovery motion on February 28, 1983.

The investigative report attached to defendant's post-conviction petition appears to have been tendered to the defense by the State in response to this discovery request. Defendant acknowledges that his trial counsel received this report before his trial. This report indicated that Stalder was willing to cooperate with Illinois authorities in exchange for a multijurisdictional deal, but it did not state that Stalder received such a deal. Defendant argues that his trial counsel should have used this report to impeach Stalder or should have investigated the matter further on his own to determine if Stalder had indeed received such a deal. We do not agree with this assertion. The record shows that the State was under a court order to disclose any information that it had regarding Stalder's receipt of a deal. The only information that the State provided, however, was that Stalder desired a particular arrangement, not that he was given it. Under the particular facts and circumstances of this case, we fail to see what more trial counsel should have done. In our view, trial counsel was entitled to rely on the State's response to his discovery request and assume that the State had accurately disclosed to him all the impeaching information within the knowledge of the State's agents. The affidavit of Stalder's attorney makes a substantial showing that the State was not forthcoming with all of the impeachment information relevant to Stalder. This affidavit, however, does not suggest that the performance of defendant's trial counsel was constitutionally deficient. We therefore reject this claim of ineffective assistance of counsel.

C. *Failure to Undermine State's Fingerprint Evidence*

Defendant submits that his trial counsel was ineffective because he failed to pursue the argument that law enforcement officials did not investigate all possible leads from unidentified fingerprints lifted from the Adams crime scene. He argues that, had his trial counsel pursued this strategy of questioning whether police performed an adequate investigation, counsel could have raised a reasonable doubt of defendant's guilt.

Defendant has failed to meet the prejudice prong of the *Strickland* test. He merely posits that some of the unidentified fingerprints "could have belonged to a person *** responsible for the murder." This pure speculation falls far short of the demonstration of actual prejudice required by *Strickland*.

D. *Failure to Present Evidence That Other Persons Were at Adams' House*

Defendant contends that his trial counsel was ineffective because he failed to present evidence suggesting that other persons were present at Adams' house around 2:30 to 3 a.m. on the morning of May 25, 1982. He argues that his trial counsel should have used this evidence to impeach Duncan's testimony that only Duncan, defendant and defendant's girlfriend were present at that time.

In support of this argument, defendant points to two police reports, which were tendered to the defense prior to trial. One police report indicates that a neighbor of Adams named David Downey thought he saw a car in Adams' driveway at about 3 a.m. in the morning of May 25, but Downey could not remember for sure because he was "pretty well drunk." The second police report contained an interview of a man named Joseph Browning. Browning stated that he saw a gold car outside Adams' house at about 2:30 a.m. on May 25. Browning, however, also indicated that he met defendant in the

county jail a short time before giving his police interview.

Initially, we note that defendant has failed to overcome the strong presumption that his counsel's decision in this regard was a matter of sound trial strategy. *Barrow*, 133 Ill. 2d at 247. Defendant's trial counsel presented an alibi defense for defendant through the testimony of his girlfriend, Rhonda Odquist. Odquist testified that no other persons were present at Adams' house after Adams left at 1 a.m. on May 25, except herself, Duncan and defendant. If counsel had presented the testimony suggested above, he would not only have called Duncan's testimony into question, but Odquist's as well. Counsel cannot be found constitutionally ineffective for failing to present testimony that would have undermined defendant's own witness.

The circuit court dismissed this claim on the ground that no prejudice resulted to defendant from his trial counsel's decision not to present Downey or Browning as witnesses. We agree. At best, their testimony could have established that a car and two other people were at Adams' house around 2:30 to 3 a.m. on May 25. The evidence at trial, however, established that Adams was murdered sometime between 7:15 a.m. and 10:15 a.m. on that day. The result of the trial would not have been different based on their testimony.

E. *Failure to Object to a Statement the Prosecutor Made in Closing Argument*

Defendant contends that his trial counsel was ineffective because he failed to object to the prosecutor's misstatement of the evidence during closing argument. At trial, Dennis Burris testified for the State that defendant had visited his house sometime in April 1982 and had seen Burris' gun collection. Burris stated that defendant commented that he had "a nice collection." As earlier noted, other evidence established that, on May

22, 1982, defendant, along with Edward Stalder and another person, burglarized Burris' house and stole several firearms, one of which was later identified as the weapon used to kill Stevens and Bushman. In closing argument, the prosecutor stated:

"Mr. Burris *** told you *** Perry Olinger was at his house *** and saw those nice guns up in that gun case. One of the guns he saw, ladies and gentlemen, was the H&R Model 649 Magnum .22 pistol, just like this one. *Perry liked it. He commented on it to Mr. Burris.*" (Emphasis added.)

Defendant asserts that his trial counsel should have objected to the emphasized portion of this comment because the prosecutor went far beyond Burris' actual testimony in an effort to tie the murder weapon more closely to defendant, to his great prejudice.

This argument is waived because it was apparent from a direct examination of the record and should have been raised on direct appeal. *Ruiz*, 132 Ill. 2d at 9. Defendant maintains, however, that his appellate counsel was ineffective for failing to raise this issue on direct appeal. A defendant who contends that appellate counsel was ineffective for failing to raise a particular issue on appeal "must show that 'the failure to raise that issue was objectively unreasonable' and that, 'but for this failure, his sentence or conviction would have been reversed.' " *People v. Flores*, 153 Ill. 2d 264, 283 (1992), quoting *People v. Caballero*, 126 Ill. 2d 248, 270 (1989). The circuit court held that defendant failed to show sufficient prejudice. We agree. Even assuming, *arguendo*, that the comment was improper, we are not able to say that defendant's conviction would have been reversed, but for his appellate counsel's failure to raise the issue on direct appeal. This comment by the prosecutor was isolated and the jury was instructed that closing arguments are not evidence.

In the alternative, defendant contends that the

366

prosecutor's comment on the evidence, above, was prosecutorial misconduct so serious as to constitute a violation of his right to due process of law. We reject this assertion. The pertinent inquiry for reviewing such claims is whether the prosecutor's comment " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157, 106 S. Ct. 2464, 2471 (1986), quoting *Donnelly v. De Christoforo*, 416 U.S. 637, 643, 40 L. Ed. 2d 431, 437, 94 S. Ct. 1868, 1871 (1974). The comment pointed to here simply does not rise to that level of unfairness. *Cf. Darden*, 477 U.S. at 182, 91 L. Ed. 2d at 157-58, 106 S. Ct. at 2472; *Williams v. Chrans*, 945 F.2d 926, 949-50 (7th Cir. 1991).

F. *Deficient Cross-Examination*

Defendant charges that his counsel was ineffective for failing to cross-examine a witness regarding a blood-like substance found in defendant's truck. Richard Cass, a crime scene technician, testified for the State that, on June 3, 1982, he examined defendant's pick-up truck. On cross-examination, defendant's trial counsel asked Cass to list all the personal items that he retrieved from the truck. Cass responded in relevant part:

"Swabbing of blood-like substance from passenger door window frame. Swabbing of blood-like substance from interior passenger door. Swabbing of blood-like substance from steering wheel and driver's door grip. A plastic jar of one half gram dietary supplement bearing blood-like stain."

Defendant maintains that his counsel should have continued his cross-examination of Cass in order to destroy any link between the blood-like stains in his truck and the bloody crime scene of the Adams homicide. He asserts that this was possible because there is nothing in the State's discovery materials to suggest that any test of the blood-like substance was ever conducted.

Defendant waived this issue by failing to raise it on

direct appeal. *Ruiz*, 132 Ill. 2d at 9. He contends, however, that his appellate counsel was ineffective as a result. The circuit court rejected this claim for lack of prejudice. We must agree, for we cannot say that but for appellate counsel's failure to raise this issue on direct appeal, defendant's conviction would have been reversed. *Flores*, 153 Ill. 2d at 283.

## G. *Defendant's Exculpatory Statement*

Defendant contends that his trial counsel was ineffective because he failed to competently argue that the jury should have been allowed to consider defendant's grand jury testimony that Edward Stalder, not defendant, retained possession of the .22 Magnum pistol used to kill Stevens and Bushman. Defendant submits that his trial counsel should have argued that this statement was admissible under the completeness doctrine.

On direct appeal, defendant's appellate counsel argued that the circuit court's failure to allow this portion of defendant's grand jury statement into evidence gave the jury the mistaken impression that he admitted keeping the murder weapon. This court found the issue waived because it was not raised at trial. *People v. Olinger*, 112 Ill. 2d 324, 338 (1986). Defendant now asserts that his appellate counsel was ineffective for failing to argue on direct appeal that his trial counsel was ineffective in his presentation of this issue to the trial court.

The circuit court dismissed this claim, ruling that defendant's grand jury statement would not have been admissible in any event. We agree. Under the "completion doctrine," when a portion of a conversation is related by a witness, the opposing party has a right to bring out the remainder of that conversation to prevent the trier of fact from being misled. *People v. Ward*, 154 Ill. 2d 272, 311 (1992). A defendant, however, "has no right to introduce portions of a statement which are not

necessary to enable the jury to properly evaluate the portions introduced by the State." *Olinger*, 112 Ill. 2d at 338.

Here, the State introduced into evidence the defendant's statement that he admitted burglarizing the Burris residence along with Stalder and Onken. Defendant's position is that, in response, he was entitled to introduce into evidence his exculpatory statement that Stalder kept the .22 Magnum pistol stolen in that burglary, which pistol was later determined to be the murder weapon. We are not persuaded that this latter statement was necessary to prevent the jurors from being misled by the former statement. Rather, the latter statement would have only served to place defendant's own exculpatory version of events before the jury without his having to take the stand and face impeachment. As this court explained on defendant's direct appeal, a defendant has no such right. *Olinger*, 112 Ill. 2d at 337-38. We therefore reject this claim for lack of prejudice.

## H. *Sentencing Phase*

Defendant next alleges that his trial counsel was ineffective for failing to investigate and call numerous witnesses in mitigation at the sentencing phase. He attached to his post-conviction petition the affidavits of 18 persons who averred that they would have been willing to testify in defendant's behalf at sentencing.

The failure to present mitigating evidence at a capital sentencing hearing does not in and of itself demonstrate that a defense attorney was ineffective. *People v. Steidl*, 142 Ill. 2d 204, 248-49 (1991). Rather, a defendant must show that defense counsel's failure to investigate and call witnesses fell below an objective standard of reasonableness under prevailing professional norms, and that, but for defense counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *People v. Perez*, 148 Ill. 2d 168, 191, 195 (1992).

A brief review of defendant's capital sentencing hearing is necessary for a proper evaluation of this claim. Following the jury trial, defendant waived his right to a jury for sentencing. A stipulation was entered that defendant was 35 years of age. The circuit court determined that defendant was eligible for the death penalty on two bases: multiple murders (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(3)) and murder in the course of another felony (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)).

The State presented the following evidence in aggravation. In 1973 defendant was convicted of unlawful possession of dynamite and sentenced to two to eight years in prison. In 1975 defendant was convicted of burglary and sentenced to a one- to three-year prison term. In 1981 defendant was convicted of criminal damage to property for shooting and killing four of his neighbor's horses when they ran through his yard. Lastly, David Willman testified regarding charges that were still pending against defendant at the time of sentencing. Willman testified that, on May 16, 1982, he and defendant engaged in a fist fight after Willman refused to lend defendant money. Defendant cut Willman's thumb with a knife. Defendant left but reappeared and fired shots at Willman. Willman and defendant engaged in another fight in which defendant knocked out three of Willman's teeth by hitting him with a pistol. Defendant then forced Willman into his pick-up truck, drove to a bridge and ordered Willman to jump off the bridge. Willman refused.

In mitigation, defendant presented the testimony of eight character witnesses, including defendant's mother. These witnesses variously described defendant as a person who would help someone out if he could; who was nice; normal; a good worker and helpful; and a friend. Defendant was also described as "a perfect gentleman." Moreover, defendant's girlfriend testified that Willman started the fight with defendant that

caused his injuries. Defendant's mother related that defendant had served four years in the military and received an honorable discharge.

The circuit court ruled that defendant's military service was evidence in mitigation, but that there was not sufficient mitigating evidence to preclude the death penalty. The circuit court then sentenced defendant to death.

Defendant has failed to demonstrate that the result of his capital sentencing hearing would have been different if his defense counsel had presented these additional witnesses. As stated, at the sentencing hearing, defense counsel presented a total of eight witnesses in mitigation, including defendant's mother. These witnesses related that defendant was a person who would help someone out if he could; who was nice; normal; a good worker and helpful; and a friend. One witness called defendant "a perfect gentleman." Additional testimony along these lines would have been merely cumulative and would not have altered the decision of the sentencing judge. Moreover, defendant, in his post-conviction petition, has pointed to no allegedly mitigating evidence that would have changed the outcome of his sentencing hearing. Absent such a showing, collateral relief is properly denied. *Stewart v. Gramley*, 74 F.3d 132, 135-37 (7th Cir. 1996).

## IV. Post-Conviction Discovery Requests

During the post-conviction proceedings below, defendant requested that he be permitted discovery in order to analyze the following items: fingerprint evidence collected by the State from the Adams crime scene; the blood-like substance found in his truck; and the four $100 bills found in his truck. Defendant asserts that, if permitted discovery of these items, he may be able to place other possible suspects at the Adams crime scene, show that the blood-like substance in his truck did not belong to the victim, Adams, and, finally, show that the

four $100 bills were proceeds from his bank loan. The circuit court denied all these requests. Defendant alleges reversible error in the circuit court's denial.

The circuit court has inherent discretionary authority to order discovery in post-conviction proceedings. *People ex rel. Daley v. Fitzgerald*, 123 Ill. 2d 175, 183 (1988). Circuit courts should exercise this inherent authority with caution, however, because post-conviction proceedings afford only limited review and "because there would exist in those proceedings a potential for abuse of the discovery process." *Daley*, 123 Ill. 2d at 183.

The circuit court correctly denied the discovery requests. The requests amount to a fishing expedition in an attempt to create some doubt of defendant's guilt. Post-conviction proceedings are limited to providing a forum for the litigation of constitutional claims that were not presented in the original proceedings. *Daley*, 123 Ill. 2d at 182. Defendant's discovery requests go beyond this limited scope and, as a result, were properly denied.

### CONCLUSION

For the reasons stated above, the judgment of the circuit court is affirmed in part and reversed in part. The circuit court's rulings are all affirmed, with two exceptions. We reverse the circuit court's dismissal without an evidentiary hearing of two claims presented in defendant's post-conviction petition. Defendant is entitled to an evidentiary hearing on the issue that the State knowingly used perjured testimony against him at his trial. Defendant is also entitled to an evidentiary hearing on the related issue that the State failed to turn over to the defense all evidence material to Edward Stalder's impeachment. This cause is therefore remanded to the circuit court for further proceedings.

*Affirmed in part and reversed in part;*
*cause remanded.*