NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 210160-U

NOS. 4-21-0160, 4-21-0161, 4-21-0364 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 9, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| JONATHAN A. CHAMBERS, | ) | Nos. 16CF298, |
| Defendant-Appellant. | ) | 16CF299, |
| | ) | 17CF107 |
| | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | | Judge Presiding. |

_____

JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1     *Held:*  (1) Defendant has not established he was denied the effective assistance of
counsel when counsel failed to object to the admission of allegedly overly
prejudicial statements during police interviews when the record establishes no
reasonable probability the outcome of the trial would have been different had
counsel made the objection.

(2) The *Krankel* inquiries into defendant's *pro se* posttrial claims of ineffective
assistance of counsel were adequate.

(3) Defendant failed to establish plain error in the admission of an alleged
statement as hearsay.

¶ 2     In this consolidated appeal of three separate direct appeals, defendant, Jonathan

Chambers, seeks the reversal of three separate convictions. Two of the convictions are for

unlawful delivery of a controlled substance (720 ILCS 570/401(d)(i) (West 2016)). The third

conviction is for attempted harassment of a witness (720 ILCS 5/8-4(a), 32-4a(a)(2) (West

2016)). Defendant was sentenced to concurrent five-year terms of imprisonment for the unlawful-delivery offenses and sentenced to eight years' imprisonment for attempted harassment, to be served consecutively to the concurrent five-year terms. Among the arguments raised in his appeals are claims he was denied the right to the effective assistance of counsel at trial; the preliminary inquiries pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984), were inadequate; and hearsay was improperly admitted. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                        A. Trial, Livingston County Case No. 16-CF-298

¶ 5        In case No. 16-CF-298, defendant was charged with the September 2016 unlawful delivery of a controlled substance, less than one gram of heroin, to a confidential source and tried before a jury in August 2017.

¶ 6        At trial, in addition to witness testimony, the jury heard two video recordings of police interrogations of defendant. The confidential source, Amy Spaniol, was the first to testify.

¶ 7        According to Spaniol, she agreed to purchase drugs for the police. On September 13, 2016, Spaniol learned she could buy heroin from Angela Huffman. She contacted Inspector Zachary Benning to inform him of this opportunity. Spaniol then met with Inspector Benning. She and her vehicle were searched. Inspector Benning gave Spaniol $40 to purchase the heroin. Spaniol left in her vehicle to pick up Huffman at Huffman's home. The two drove to Sherman Avenue in Pontiac. There, defendant, whom she had not seen before this day, approached the vehicle on a bicycle. He leaned into the passenger window. Huffman handed defendant the money. Defendant handed Huffman the heroin. Huffman then gave the heroin to Spaniol. The interaction with defendant lasted "probably" 10 to 15 seconds. Spaniol returned Huffman to her house. Spaniol drove to the police station to meet with Inspector Benning and to give him the

- 2 -

heroin.

¶ 8          According to Spaniol, she had not purchased drugs for the police before that day. Spaniol agreed to participate in the controlled buy because she "needed to do something to make up for what [she] did." Spaniol testified she had a case pending where she pleaded guilty to possession of heroin and was awaiting sentencing. When Spaniol was asked if she hoped the sentencing court would take into account her work as a confidential source, Spaniol stated, "There's no guarantee of that."

¶ 9          Inspector Benning testified he worked as a narcotics officer with the Livingston County Sheriff's Office. After Spaniol contacted him regarding an opportunity to purchase heroin, he met with her. A female correctional officer searched Spaniol. Inspector Benning and Officer Brian Maier searched Spaniol's vehicle. No contraband or anything larger than "loose change" were found. Officers, including Inspector Benning, followed and observed Spaniol during the controlled buy. The location of the transaction was moved twice while Spaniol was being surveilled. Inspector Benning learned of the changes in location through text messages he was receiving from Spaniol as she was driving. Inspector Benning observed defendant ride the bicycle away from Spaniol's car. At the sheriff's department, Spaniol handed two bags of heroin to Inspector Benning.

¶ 10          Inspector Benning interviewed defendant about this transaction in December 2016. The interview did not occur earlier due to a pending investigation. A video of this interview was played for the jury. According to the video, which is a little over three minutes long, Inspector Benning asked defendant how long he had been selling heroin in Pontiac. Defendant responded he mostly got it for himself. From time to time, defendant had given heroin to someone for free. Defendant admitted he had charged someone before. When he did, he

charged $10 for a bag. Defendant could not remember the last time he had provided heroin to someone. Inspector Benning informed defendant they watched him deliver to a confidential source while on a bike. Defendant asked, "On a bike?" Defendant shook his head and said, "I don't know." Inspector Benning informed defendant that transaction from a bicycle occurred in September. Defendant said he could not "picture that date." Defendant denied selling heroin to Angela Huffman. He said he hung out with her "a lot" and Huffman got heroin from everyone. Defendant said Huffman was never a passenger in a car when he was on a bike. Defendant had not seen Huffman sitting on the passenger side of a car "ever." Huffman always rode in the backseat. Inspector Benning told defendant he saw him throw a bag of heroin at her.

¶ 11        Inspector Benning testified, after the interview, as he was walking with defendant from the sheriff's department to the jail, defendant said he wanted to work for the police and help himself. Inspector Benning declined, saying he did not trust defendant as defendant was not being honest with him. Defendant then "admitted that he probably did it[,] but he [didn't] remember exactly doing it."

¶ 12        On cross-examination, Inspector Benning testified sometimes it was normal operating procedure to have "an audio overhear" or microphone on the confidential source. That was not done in this case. Inspector Benning also stated the transaction was not videotaped as the vehicles were moving and he believed it was unsafe to drive and record with his cell phone. Huffman was the original target of the controlled buy. Inspector Benning agreed Huffman was not searched. Inspector Benning did not observe the transaction. He only saw defendant as he was walking away. At that time, defendant "was approximately maybe a couple hundred feet" from him. Defendant was not stopped or interrogated that day. Marked money used to purchase the heroin was not recovered.

¶ 13 Officer Maier, a police officer with the Dwight police department, testified he assisted Inspector Benning with the September 13, 2016, controlled buy. On that day, Officer Maier saw defendant on a bicycle. Defendant rode the bicycle to the passenger side of a vehicle. Within seconds of his arrival, defendant reached inside the passenger window with a closed fist. When defendant pulled his arm from inside the passenger side of the vehicle, he had a closed fist. The encounter lasted less than 30 seconds. Spaniol was the driver of the vehicle. Huffman sat on the passenger side.

¶ 14 According to Officer Maier, he interviewed defendant in December 2016 at the sheriff's department. Over defendant's standing objection on the ground the interview revealed prior bad acts, the recording of that interview was played for the jury.

¶ 15 At the beginning of the video, Officer Maier told defendant he knew defendant had been selling heroin for quite some time and he was trying to determine why defendant chose to sell heroin. Officer Maier questioned whether the motive was for money. Defendant did not answer. Officer Maier asked defendant if he was working. Defendant said he was not. Officer Maier explained he bought drugs from dealers and from people who sold drugs to support their habit. Officer Maier told defendant he had bought drugs from defendant. Defendant repeatedly denied Officer Maier purchased drugs from him. Officer Maier insisted he did: "[L]isten, I'm telling you I bought drugs off of you. *** Listen, listen to me. I'm telling you, you are selling heroin to support your habit. That's exactly what you are doing. *** You are selling heroin." Officer Maier guaranteed defendant he bought heroin from him. Officer Maier stated he had seen defendant sell heroin from a bicycle. Officer Maier repeated he was simply trying to determine defendant's motive for doing so. He said, "It doesn't seem like you're trying to be the El Chapo of Pontiac." Officer Maier asked if he was selling to kids. Defendant replied, "F*** no." Officer

Maier then asked if he was doing it to bring in some extra money as he was out of work. Defendant said, "People come down here and sell drugs and they ask me to help them." Defendant said he would help them by talking to a person, but once inside, defendant would not touch anything.

¶ 16 Officer Maier, according to the video, repeatedly told defendant he watched him deal drugs. He emphasized he watched defendant sell "from a bike [—] reach inside a car and do a hand[-]to[-]hand." Shortly after being asked if he wanted to be "the big drug dealer of Livingston County" or if he was simply trying to support his children, defendant admitted, "I probably have sold a couple bags to somebody to support my habit," but he denied having sold heroin while riding a bike. Officer Maier again asked defendant if he was selling heroin to provide for his children. Defendant told Officer Maier that Officer Maier could not help him. Wiping tears from his eyes, defendant stated he "did it to buy my kids Christmas gifts." Defendant stated he attempted to stop "cold turkey" but he got "sweats at night."

¶ 17 On cross-examination, Officer Maier testified he was "[p]robably less than" 50 feet from the transaction. He did not photograph the transaction for fear of jeopardizing Spaniol's safety. Officer Maier agreed he did not observe an actual exchange of drugs for money.

¶ 18 The State presented testimony establishing the contents of the bags contained heroin and Spaniol was searched before the controlled buy. Defendant was found guilty.

¶ 19 B. Trial, Livingston County Case No. 16-CF-299

¶ 20 In case No. 16-CF-299, defendant was charged with the December 15, 2016, offense of unlawful delivery of a controlled substance, heroin (720 ILCS 570/401(d)(i) (West 2016)). Because of a mistrial, two trials were held on the charge. Only the testimony from the

retrial is relevant to this appeal.

¶ 21        At the June 2017 trial, the State called multiple witnesses. The first to testify was Jamie Ware, a confidential informant who worked with Officer Maier. On December 15, 2016, Ware testified she called defendant to see if she could get "three for 50," meaning three bags for $50. After the call, Ware contacted Officer Maier. The two met at the liquor store in Dwight, Illinois, and then went to the sheriff's department in Pontiac, Illinois. Ware was provided "audio," which she put in her jacket pocket. Ware was searched and then provided cash from the police department to purchase the heroin. Officer Maier drove Ware to about four houses from where she was meeting defendant. At the meeting location, Ware went inside and followed defendant to the kitchen, where Ware and defendant exchanged the money for drugs. Ware left immediately after the exchange. She returned to Officer Maier and gave him the plastic bags.

¶ 22        Ware acknowledged, between 2007 and 2011, she had some convictions for theft, obstructing, aggravated battery, and retail theft. In 2017, Ware was charged with retail theft, and that case remained pending. Ware testified she was not promised anything for her testimony other than "consideration."

¶ 23        Officer Maier testified on December 15, 2016, Ware contacted Officer Maier regarding the potential to purchase heroin from defendant. When Ware arrived at the police department, she was searched for contraband. Ware was provided "prerecorded police money" to use for the transaction. This is money the police photocopy. The money was placed in Ware's pocket. Officer Maier and another officer drove Ware to the residence. They dropped off Ware directly in front of the residence. Ware exited the vehicle and walked to the front door. Ware was under surveillance from the time she entered the residence through the time she exited and returned to Officer Maier's vehicle. Ware handed Officer Maier plastic bags that had a logo

"with a devil's head." Those baggies contained a white powdery substance.

¶ 24        Officer Maier testified he interviewed defendant "some weeks" after December 15, 2016, at the Livingston County Sheriff's Office. A video and audio recording was made of that interview and was played for the jury. In the video, defendant admitted he got drugs from "Rico." Defendant stated he was not the only one "doing hand-to-hand [buys]." He admitted being a user and having tried to go "cold turkey." Officer Maier suggested defendant was selling heroin to get his children Christmas gifts. Defendant admitted having "probably sold it once or twice or something like that."

¶ 25        Two officers testified they searched Ware on December 15, 2016, and found no contraband on her. A forensic scientist testified the substance in one of the bags contained heroin. The other two bags were not tested, as "the total weight of the three wasn't going to go over any weight statute."

¶ 26        Defendant was found guilty.

¶ 27         C. Posttrial Proceedings in Case Nos. 16-CF-298 and 16-CF-299

¶ 28        In January 2018, defendant filed multiple *pro se* motions alleging he was denied the effective assistance of counsel. In these motions, he stated the motions applied to his conviction for the September 2016 offense, as well as to his conviction for the December 2016 offense. Reasoning defendant was represented by counsel, the trial court did not address the ineffectiveness claims but struck the *pro se* motions.

¶ 29        A joint sentencing hearing was held on his unlawful-delivery convictions. The trial court sentenced defendant to concurrent terms of five years in prison.

¶ 30                D. Trial, Livingston County Case No. 17-CF-107

¶ 31        In April 2017, the State initially charged defendant with three offenses when he

indirectly contacted Jamie Ware with the intent to deter her from testifying against him at his trial for unlawful delivery of a controlled substance (case No. 16-CF-299): harassment of a witness (720 ILCS 5/32-4a(a)(2) (West 2016)), bribery (720 ILCS 5/33-1(a) (West 2016)), and communication with a witness (720 ILCS 5/32-4(b) (West 2016)). Later, these three charges were dismissed, but the charge of attempted harassment of a witness (720 ILCS 5/8-4(a), 32-4a(a)(2) (West 2016)) was added. For the attempted harassment charge, the State alleged defendant, with the intent to commit the offense of harassment of a witness, performed "a substantial step toward the commission of that offense" by communicating with "Shad Hamilton to discuss his case with Jamie Ware." Defendant was tried only on the attempt charge.

¶ 32    Only two witnesses testified at defendant's January 2018 jury trial, defendant's friend Shad Hamilton and Officer Maier. The State also introduced into evidence four recordings of telephone conversations between Hamilton and defendant, who was incarcerated at the time of those conversations.

¶ 33    Hamilton had known defendant for over two decades. The two spoke over the phone multiple times in January and February 2017 while defendant was incarcerated at the Livingston County jail. Hamilton agreed he had listened to the recordings of those conversations and the recordings accurately and fairly depicted them.

¶ 34    The State then played the recordings for the jury. In the January 25, 2017, call, defendant asked Hamilton, "[A]m I good, bro? Like, like I gotta speak in code so you know. Like remember when we [were] in Mt. Sterling, what I did for you, right?" Hamilton said he did. Defendant repeated, "Am I good?" Hamilton asked defendant if he knew "who it was," to which defendant replied, "[Y]eah, I already know. J.W." Defendant asked a third time, "Am I good though?" Hamilton replied, "Yeah, I think so. She's going to treatment so she's not gonna be

there. She probably won't be there for the—for the trial, you know. She feels bad. You're her friend, man." Defendant replied he "loved [Ware] to death, bro, like that's my sister." Hamilton responded, "[Y]ou know she feels bad about the whole situ—. I'm not—I don't f*** with her right now; I'm not talking to her at all." Defendant interrupted, "[B]ut I need you to though. I need you [to] though. *** Don't just brush her away, like, make sure, like you know." Hamilton did not think Ware would be at the trial as she did not want to testify "in the first place." Hamilton also did not believe the State had a case against defendant if Ware did not show up for the trial; defendant agreed. Defendant said, "If I'm good, I'm good, you know what I'm saying. I won't sweat it."

¶ 35     During the second phone call, defendant asked Hamilton if Hamilton had talked to Ware. Hamilton replied he had not but he had someone else in mind to talk to her. Hamilton said he knew Ware was attending church on Sunday and he would have someone "work on it." Hamilton said he "honestly believe[d]" Ware would not testify as she said she would not. Defendant replied, "I hope that's right because I'm going to take it all—I'm going to take it all the way if she's not. I hope she don't because you know I love her. I look at her like a sister, bro." Defendant continued, stating he was not angry with Ware. Hamilton replied, "This is some f*** up s***, man. I know—I know exactly how you feel. I've been through the same s***." Hamilton told defendant to call him later that week.

¶ 36     During the third call, which occurred five days later, defendant asked Hamilton if everything was "good." Hamilton replied that it was: "Yeah, you're good. Just keep in touch with me *** I'll keep you updated."

¶ 37     The fourth call occurred three weeks later. In that call, Hamilton told defendant he had spoken "to that one person." Hamilton told defendant to "take it all the way, you're good."

Defendant replied, "[T]hanks[,] bro."

¶ 38 Hamilton stated he and defendant were at "Mt. Sterling" together. Defendant was friends with someone Hamilton's "charges were against." Defendant told Hamilton he would talk to that person for Hamilton and that individual would not be present to testify at Hamilton's trial. When defendant asked during the phone conversation if Hamilton remembered Mt. Sterling, that situation is what Hamilton thought of.

¶ 39 Hamilton spoke to Ware about her testifying at defendant's trial. Hamilton had previously been to rehab. He believed when a person is in rehab that person could not be forced to testify. Hamilton denied overtly threatening Ware. Even before defendant was charged, he tried to get Ware into treatment. Ware had been in some legal trouble, and Hamilton wanted to help her and her baby.

¶ 40 Officer Maier, a narcotics investigator with the Livingston County Proactive Unit, testified as part of this role, he worked with undercover sources. Ware was an undercover source and "a chief witness" in case No. 16-CF-299. During January and February 2017, defendant was incarcerated on the controlled-substance charges. Officer Maier listened to recordings of the telephone conversations between Hamilton and defendant. The following questions and answers occurred, during which an objection was made after the State used the word "help:"

"[THE STATE]. Did you speak with [Ware] about the recordings?

A. Yes.

Q. She had come to you regarding help for what was happening?

A. Correct.

[DEFENSE COUNSEL]: Objection.

THE COURT: Hold on. What was the objection?

[DEFENSE COUNSEL]: Hearsay regarding help.

THE COURT: That's not a hearsay statement. Overruled. The jury can consider.

[THE STATE]: Thank you, Judge.

Q. And without saying anything that she told you, you gave her help with the situation. Correct?

A. Correct.

Q. And investigated it, as far as getting the phone calls to my office?

A. Correct."

¶ 41   The State, in rebuttal closing argument, referenced "help" from Officer Maier's testimony:

"And as far as harassment, Jamie Ware sought out the help of law enforcement after the conversation. As far as her emotional distress, she sought out the help and received from Officer Maier assistance in this. She's not even in the area anymore.

So as far as evidence of what exactly transpired with Jamie Ware and this harassment that the defense says isn't there, I think you have everything you need to find that it is. ***

The situation clearly put her in a situation where she was uncomfortable. Situation where she knew I'm going to be getting,

there's going to be stuff going on if I don't avoid testifying in

court."

¶ 42 The jury, during deliberations, posed the following question to the trial court: "Can you verify that the officer testified that Jamie Ware contacted Officer Maier after all of the phone recordings?" The jury was given the transcript of Officer Maier's testimony.

¶ 43 The jury found defendant guilty of attempted harassment.

¶ 44 E. Posttrial Proceedings in Case No. 17-CF-107

¶ 45 In case No. 17-CF-107, defendant was sentenced to eight years' imprisonment, to be served consecutively to the sentences received in case Nos. 16-CF-298 and 16-CF-299.

¶ 46 In March 2018, while a posttrial motion filed by counsel was pending, defendant filed a *pro se* motion titled, "motion to appeal sentence and appeal cases, reconsider sentence," in which he alleged errors in this case as well as in the unlawful-delivery cases (case Nos. 16-CF-298 and 16-CF-299). Regarding case No. 17-CF-107, defendant alleged his trial counsel provided ineffective assistance in that he failed to object to the State's request for an extended-term sentence. He further alleged counsel failed to object to Officer Maier's testimony that included "second[-]hand statements."

¶ 47 Upon finding defendant was represented by counsel, the trial court dismissed defendant's *pro se* posttrial motion. The court denied counsel's motion to reconsider the sentence. Defendant pursued a direct appeal.

¶ 48 F. Defendant's Postconviction Claim, Case No. 17-CF-107

¶ 49 While defendant's direct appeals in all cases were pending, defendant filed, in February 2019, a *pro se* petition under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)). In his postconviction petition, defendant raised multiple claims of

constitutional error, including he was denied his sixth-amendment right to confront witnesses against him when testimonial hearsay was allowed without objection by trial counsel. See U.S. Const., amend. VI. Specifically, defendant points to Officer Maier's testimony Ware came to him for "help."

¶ 50    In May 2019, the trial court summarily dismissed defendant's postconviction petition, finding it frivolous and patently without merit. Defendant appealed the dismissal of his postconviction petition and the appeal is currently pending before this court (appellate case No. 4-19-0523).

¶ 51                    G. Defendant's Appeals

¶ 52            1. *Case No. 16-CF-298, Appellate Case No. 4-18-0340*

¶ 53    One of the issues raised in defendant's appeal was the trial court's failure to conduct a *Krankel* injury after he alleged, posttrial, he was denied the effective assistance of counsel. The State conceded a *Krankel* inquiry should have been conducted. We agreed and remanded the case for an inquiry into defendant's *pro se* claims of ineffective assistance of counsel pursuant to *Krankel*. *People v. Chambers*, 2020 IL App (4th) 180340-U, ¶ 2.

¶ 54            2. *Case No. 16-CF-299, Appellate Case No. 4-18-0341*

¶ 55    Similarly, one of the claims raised in defendant's direct appeal was the trial court's failure to conduct a *Krankel* inquiry after he alleged, posttrial, he was denied the effective assistance of trial counsel. The State again conceded a *Krankel* hearing should have been held. In this case, defendant also raised double-jeopardy arguments, which we rejected. We remanded, however, for an inquiry into defendant's *pro se* claims of ineffective assistance of counsel pursuant to *Krankel*. *People v. Chambers*, 2021 IL App (4th) 180341-U, ¶ 2.

¶ 56            3. *Case No. 17-CF-107, Appellate Case Nos. 4-18-0342 and 4-19-0523*

¶ 57    Both the direct appeal (appellate case No. 4-18-0342) and the appeal from the postconviction petition were consolidated for our review (appellate case No. 4-19-0523). In the direct appeal of his attempt conviction, defendant asserted, in part, he was entitled to a *Krankel* inquiry. We agreed. We remanded for *Krankel* inquiry but concluded it would be premature to rule on case No. 4-19-0523 until the resolution of the *Krankel* inquiry. We severed the appeals. *People v. Chambers*, 2021 IL App (4th) 180342-U, ¶¶ 2, 20, 22.

¶ 58                                  H. *Krankel* Hearing

¶ 59                           1. *Case Nos. 16-CF-298 and 16-CF-299*

¶ 60    The *Krankel* hearings for case Nos. 16-CF-298 and 16-CF-299 were held on the same day in March 2021. The issues regarding each case were addressed separately. The court first addressed the issues defendant raised as to case No. 16-CF-299.

¶ 61    At the beginning of that hearing, the trial court summarized to defendant what it believed defendant was arguing. The court surmised defendant was arguing he was denied the effective assistance of counsel when trial counsel (1) failed to call two witnesses, Connor Corrigan and Angela Cassani, to testify at trial; (2) did not permit defendant to listen to certain telephone calls before trial that allegedly contained exculpatory information; (3) developed no trial strategy; (4) failed to investigate the case; and (5) did not file a motion to suppress the statements.

¶ 62    Defendant explained, had the calls from case No. 17-CF-107 been played fully for the jury, the jury would have seen he did not commit the offense in case No. 16-CF-299. Defendant argued those calls showed Ware told Hamilton she was being pressured by the prosecution to testify. The trial court asked defendant if he spoke to Ware. Defendant stated he did not but that he relayed what Hamilton had told him. According to defendant, Hamilton said

- 15 -

in the call Ware "was going to come to court and tell the truth that [defendant] didn't do anything." Defendant also maintained Ware told Corrigan and Cassani the same. When the court asked defendant how this amounted to ineffective assistance, defendant said he presented the affidavits to his trial counsel before trial.

¶ 63        As to his allegations regarding a lack of a trial strategy, defendant asserted counsel told him he would file a motion to suppress the interrogation but failed to do so. When asked if that was all he was arguing, defendant responded as follows: "It's pretty much everything, but once trial started, I was trying to whisper in [trial counsel's] ear about certain things that was stated, and basically it was like, I got this type ordeal. He didn't object to the interrogation videos at the trial when they kept trying to say that I was something like El Chapo, or that when they kept lying, stating that they witnessed me do certain things."

¶ 64        The trial court then asked defendant's trial counsel, Brian Gabor, to address defendant's assertions. Counsel stated, as for the whispering, he had informed defendant to write notes during trial instead of whispering. This allowed counsel to continue to hear the witnesses while allowing defendant to voice his concerns.

¶ 65        Regarding Corrigan and Cassani, counsel stated the affidavits for those witnesses were provided to him three to six months after the trial and the guilty verdict. As for the allegations regarding the motion to suppress, counsel reported he and defendant often disagreed with how to proceed in the case. Counsel did not file the motion to suppress defendant wanted as counsel concluded there was no merit to the proposed motion.

¶ 66        Counsel also informed the trial court defendant was permitted to listen to the recordings of the telephone calls between him and Hamilton before trial. As for the trial preparation and tactics, counsel reported having met defendant numerous times at the jail to go

through discovery and to discuss how to proceed. While they disagreed at times about trial strategy, counsel reported the trial strategy was to question the credibility of Ware and Spaniol, to question the officers' ability to observe and overhear, and to question the quality of the audio recordings.

¶ 67 The trial court proclaimed for the record it reviewed the reports of proceedings in the cases and was familiar with the cases. The court recalled "much of" the matters discussed at the *Krankel* hearing. The court found, based on its observations, defendant "was a difficult client to deal with in terms of his expectations for the case." Defendant exhibited "a little chip on your shoulder kind of attitude." The court recalled defendant constantly talking to counsel during trial. The court concluded the cases were "strong cases for the State" and informed defendant the following:

> "[N]one of your specific claims of ineffective assistance of counsel
> really rise to the level that you think they do. There just is nothing
> to indicate that you had ineffective assistance of counsel. To the
> contrary, I do think that Mr. Gabor was very well prepared[;] he
> put in a lot of time on this case. I know that because he was very
> well prepared, and there were a number of cases that were
> involved. He knew the evidence, he knew the witnesses, he knew
> the issues, and he did the best that he could with regards to the
> facts that he had."

¶ 68 The trial court concluded Gabor "did an excellent job on this case." The court found, "The problem isn't Mr. Gabor[;] the problem is the facts of the case. That's the problem. He can only do so much." The court found defendant's ineffectiveness claims "vague and

conclusory." The court declined defendant's request to appoint new counsel and denied defendant's *pro se* claim.

¶ 69                    2. *Case No. 17-CF-107*

¶ 70        At the start of the *Krankel* hearing, the trial court adopted its findings from the *Krankel* hearing held in case Nos. 16-CF-298 and 16-CF-299 as those findings related to defendant's arguments in case No. 17-CF-107. The court summarized the arguments defendant made in his *pro se* posttrial motion alleging ineffective assistance of trial counsel as follows:

> "[Y]our complaints about Mr. Gabor were that you were not
> admonished at any point before the trial or after the trial that you
> were extended[-]term eligible on the Class 3 felony attempt
> harassment, that Counsel did not object to the extended[-]term
> sentence, that Counsel did not object to the filing of the amended
> information, that Counsel did not call witnesses, although you
> didn't, I couldn't see where you identified any specific witnesses,
> and that Counsel didn't object to altered phone calls."

¶ 71        After being asked if those were his complaints in this case, defendant agreed they were but asserted he had others that were not included in the motion. Among those relevant to this appeal are defendant's contentions (1) the calls were "blended differently" and not "the same conversation" he had with Hamilton and (2) the last part of the telephone conversations were not played for the jury, which would have shown Ware told Hamilton the state's attorney was harassing her to testify.

¶ 72        The trial court then asked counsel to speak to defendant's allegations. Counsel responded to many of defendant's ineffectiveness claims which are no longer being pursued on

- 18 -

appeal. Relevant to this appeal, counsel replied the State had the audio recordings, which spoke for themselves.

¶ 73        The trial court found defense counsel "very, very extremely prepared." The court found him competent and capable. The court observed the record showed defendant was not afraid to speak up in the courtroom. The court noted defendant initially filed a motion to proceed with the trials *pro se* but withdrew his own motion, and defendant interrupted the court multiple times. The court emphasized defendant did not, however, once raise concerns about counsel's effectiveness. The court concluded defendant was attempting "to get a second bite at the apple."

¶ 74        The trial court declined to appoint new counsel.

¶ 75        This consolidated appeal followed.

¶ 76                        II. ANALYSIS

¶ 77        A. Effectiveness of Counsel, Case No. 16-CF-298

¶ 78        Defendant argues he was denied the effective assistance of trial counsel when counsel failed to object to the admission of the two interrogation videos as containing irrelevant and prejudicial statements. Defendant acknowledges counsel objected to the videos by asserting they referred to prior bad acts, an objection the trial court overruled. He, however, highlights as irrelevant and overly prejudicial the questions by the officers asking if defendant was trying to be the "El Chapo" of Pontiac or if he sold to children and Inspector Benning's assertion defendant was lying as there was "no denying" he sold heroin. Defendant further maintains the record reveals a reasonable probability the outcome of the trial would have been different had these statements been redacted and not shown to the jury. Defendant emphasizes the fact Spaniol was biased as she was seeking consideration in sentencing in her own case and the purchase was not controlled as no one searched Huffman.

¶ 79        When a defendant claims denial of the constitutional right to the effective

assistance of counsel, he or she carries the burden of establishing the two-pronged test set forth

in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *People v. McGath*, 2017 IL App (4th)

150608, ¶ 37, 83 N.E.3d 671. Under *Strickland*, to obtain relief, the defendant must prove the

following: (1) counsel's representation "was objectively unreasonable under prevailing

professional norms" and (2) a reasonable probability exists, " 'but for counsel's unprofessional

errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL

113688, ¶ 36, 987 N.E.2d 767 (quoting *Strickland*, 466 U.S. at 694). The second prong, or

prejudice prong, is satisfied with proof of a probability sufficient to undermine confidence in the

proceeding's outcome. See *People v. Coleman*, 2015 IL App (4th) 131045, ¶ 80, 25 N.E.3d 82.

A defendant's failure to prove either prong of the *Strickland* test precludes a finding counsel was

ineffective. *McGath*, 2017 IL App (4th) 150608, ¶ 37.

¶ 80        Defendant's ineffectiveness claims are based on the allegation statements in the

video were irrelevant and overly prejudicial. To be relevant, evidence must either render a matter

at issue more or less probable or tend to prove a fact in controversy. See *People v. Lynn*, 388 Ill.

App. 3d 272, 280, 904 N.E.2d 987, 994 (2009). "[E]ven relevant evidence may be excluded

where its probative value is substantially outweighed by its prejudicial effect." *People v.

Whitfield*, 2018 IL App (4th) 150948, ¶ 47, 103 N.E.3d 1096. The question of whether evidence

is relevant and admissible is a question within the trial court's discretion, meaning we will not

overturn a decision to admit evidence unless the decision is arbitrary, fanciful, or unreasonable.

*Id.* ¶ 46. The determination of whether evidence is overly prejudicial is also reviewed for an

abuse of discretion. See *People v. Wilson*, 214 Ill. 2d 127, 141, 824 N.E.2d 191, 199-200 (2005).

¶ 81        Without ruling on the reasonableness of trial counsel's representation, we find

defendant cannot prove the second *Strickland* prong of his claim. There is no reasonable probability the outcome of defendant's trial would have been different absent a showing of the video. Spaniol, who had been searched before the controlled buy, identified defendant and not Huffman as the individual who sold her heroin. While she had some motivation to assist police officers by participating in a controlled purchase, there are no facts to show greater consideration would be afforded if defendant were the target of the investigation rather than Huffman. Police officers worked together to surveil Spaniol. Both Inspector Benning and Officer Maier testified to having observed defendant near the vehicle Spaniol was in. Officer Maier observed defendant, while on a bicycle, putting his closed fist inside the vehicle and pulling out a closed fist from the vehicle. Inspector Benning saw defendant after he left the vehicle's side. Spaniol returned to the police station with two bags of heroin. After the interview with Inspector Benning, defendant, upon seeking to work for the police, admitted he "probably did it" but he did not "remember exactly doing it."

¶ 82                              B. Adequacy of the *Krankel* Hearings

¶ 83        In this consolidated appeal, defendant challenged the adequacy of the *Krankel* inquiry in all three cases.

¶ 84        A defendant triggers the common-law procedure of *Krankel* when he or she asserts in the trial court a *pro se* claim of ineffective assistance of counsel. *People v. Rhodes*, 2019 IL App (4th) 160917, ¶ 12, 128 N.E.3d 1100. The "narrow purpose" of the *Krankel* inquiry is to permit the trial court to determine whether new counsel should be appointed to argue the defendant's *pro se* posttrial claims of ineffective assistance of counsel. *People v. Ayres*, 2017 IL 120071, ¶ 11, 88 N.E.3d 732.

¶ 85        Here, we are tasked with determining "whether the trial court conducted an

adequate inquiry into *** defendant's *pro* se allegations of ineffective assistance of counsel." *People v. Moore*, 207 Ill. 2d 68, 78, 797 N.E.2d 631, 638 (2003). To perform an adequate inquiry, the inquiry must be "sufficient to determine the factual basis of the claim." *Ayres*, 2017 IL 120071, ¶ 11 (quoting *People v. Banks*, 237 Ill. 2d 154, 213, 934 N.E.2d 435, 468 (2010)). During this inquiry "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *Moore*, 207 Ill. 2d at 78. The court may evaluate a defendant's *pro se* claims of ineffective assistance of counsel based on "its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Id.* A trial court may also extinguish a defendant's ineffectiveness claims upon finding the claims lack legal or factual merit. See *People v. Roddis*, 2020 IL 124352, ¶¶ 55, 56, 61. When, however, allegations reveal possible neglect of the case, the trial court should appoint new counsel for additional proceedings. *Ayres*, 2017 IL 120071, ¶ 11.

¶ 86        This court reviews *de novo* the manner employed by the trial court in conducting the *Krankel* hearing. *People v. Lawson*, 2019 IL App (4th) 180452, ¶ 43, 139 N.E.3d 663.

¶ 87                            1. *Case No. 16-CF-298*

¶ 88        Defendant argues the trial court conducted an inadequate *Krankel* inquiry into his claim trial counsel should have objected to the interrogation videos admitted at trial because the court did not address his claim or ask trial counsel to respond to it. Defendant maintains the trial court prevented the development of a record sufficient for a determination of whether his claim had merit. In addition, because of the court's alleged animosity toward defendant, he seeks a new *Krankel* inquiry before a different judge.

- 22 -

¶ 89     We do not find the inquiry inadequate. Above, we rejected defendant's claim counsel was ineffective for not objecting to the interrogation videos on the ground of containing overly prejudicial information. Recently, the Third District refused to find a *Krankel* hearing inadequate when the same ineffectiveness claim had been found meritless. *People v. Barner*, 2022 IL App (3d) 20043-U, ¶¶ 30, 34. We find this approach applicable here. Our determination on the effectiveness of counsel turns on the second *Strickland* prong, *i.e.*, prejudice, and not on the question of whether trial counsel's approach was reasonable or a matter of trial strategy. No statement by trial counsel regarding strategy was therefore necessary. The *Krankel* inquiry on this matter was sufficient.

¶ 90                    2. *Case No. 16-CF-299*

¶ 91     Defendant contends the trial court conducted an inadequate *Krankel* inquiry into his claim trial counsel was ineffective for not calling two witnesses who would have testified the State pressured Ware to testify and Ware denied buying heroin from defendant. Defendant further contends the inquiry was inadequate as he asserted counsel was ineffective in not introducing a phone call between defendant and Hamilton in which Hamilton told defendant the State was pressuring Ware to testify and Ware said she did not buy heroin from defendant.

¶ 92     As to his first claim, regarding trial counsel's failure to call two witnesses, defendant references the affidavits signed by Connor Corrigan and Angelo Cassani. Both affidavits appear in the record. Defendant acknowledges in his reply brief these affidavits were filed after trial, as counsel asserted during the *Krankel* hearing. Defendant contends, however, the fact the affidavits were signed after trial does not mean trial counsel was possibly ineffective for not investigating those witnesses *before* trial.

¶ 93     Defendant's argument fails, as the record reveals the trial court had sufficient

information to determine the factual basis of this claim. The trial court heard defendant's allegation on this matter, and the record contains both affidavits. The affidavits plainly establish neither counsel nor defendant knew about these witnesses before trial. In case No. 16-CF-299, defendant's trial was held on June 27, 2017. Cassani signed his affidavit in December 2017. In that affidavit, Cassani averred he told defendant of his conversations with Ware after *meeting* defendant at the earliest in August 2017: "I am currently incarcerated in the Livingston County jail. When I got here in August of 2017[,] I heard of this guy named Jon-Jon[.] [W]hen I first met him I apologized to him for what my friend *** Ware did to him."

¶ 94        Corrigan's September 2017 affidavit shows Corrigan did not know defendant in "June-July, 2017." According to Corrigan, Ware told him, "[o]n or about June-July, 2017," that she "snitched on Jon-Jon, (Jonathan Chambers)." Corrigan averred "at the time, [he] did not know Jon-Jon at all, but [he] felt bad about the situation." Corrigan then stated he "met Jon-Jon for the first time in county jail, where" Corrigan was incarcerated at that time.

¶ 95        The trial court was aware of defendant's factual assertions and of the record before it. The *Krankel* inquiry was sufficient.

¶ 96        Defendant next asserts the trial court failed to inquire adequately into his claim counsel was ineffective for not introducing at trial the phone conversation he had with Hamilton, during which Hamilton relayed Ware's admission she lied about purchasing heroin from defendant. Defendant acknowledges the court gave counsel the opportunity to speak to this allegation but contends counsel's answer was nonresponsive.

¶ 97        At the *Krankel* inquiry, counsel asked the trial court if there was anything else he had not addressed. After the court said, "The phone calls with [S]had Hamilton—," counsel replied, "Anything that we had, [defendant] was allowed to review and hear prior to trial."

¶ 98    We do not find the inquiry inadequate, as the inquiry was adequate to ascertain the factual basis of defendant's claim. First, as defendant admits, the trial court asked both defendant and trial counsel to comment on this allegation. Second, the record and the court's observations at trial additionally provide the factual basis necessary to resolve this claim. From those sources, the record establishes the use of the recording, as defendant now suggests should have been done, would have in fact been catastrophic for him in both case Nos. 16-CF-299 and 17-CF-107. Even if defendant could have overcome the high hurdle of a hearsay objection to the admission of a telephone recording of Hamilton speaking about his alleged conversations with Ware, the playing of that recording would have opened the door to the jury hearing defendant's conversations with Hamilton regarding Ware. In those conversations, defendant repeatedly insisted Hamilton convince Ware not to testify in case No. 16-CF-299. Defendant also admitted other bad conduct in the call, such as admitting he had done something similar on Hamilton's behalf, convincing someone not to testify against Hamilton when Hamilton was incarcerated. Moreover, Ware would likely have been called in rebuttal and questioned about the alleged conversation with Hamilton. Such testimony may have given the State what it needed to pursue, in case No. 17-CF-107, not only charges for the inchoate offense of attempted harassment, but also for the completed offense of harassment. No further statement from counsel was needed for the court to know what defendant was arguing and to determine whether counsel's conduct to not pursue such a course was reasonable.

¶ 99                    3. *Case No. 17-CF-107*

¶ 100    Defendant argues the trial court's inquiry into his ineffectiveness claim in case No. 17-CF-107 was inadequate for two reasons. First, defendant contends the trial court failed to inquire adequately into his claim counsel failed to object to the altered phone calls between

Hamilton and him.

¶ 101    During the *Krankel* inquiry, the trial court asked defendant, "What is this altered phone call?" Defendant responded as follows: "They was cutting in and out; and you could barely hear most of the things that was stated inside the phone calls, like certain things what Shad would say or what I say[.] [I]t was like blended differently. It wasn't like the same conversation that was held between me and Shad." The court asked a follow-up question to determine the factual basis of that claim: "And you are just basing that on the fact that you were on the phone call?" Defendant replied affirmatively. After eliciting defendant's explanation on this issue and a number of others, the trial court asked counsel to respond in general to defendant's multiple claims. During his explanation, counsel referenced the recordings. The language defendant uses in support of his claim counsel was unresponsive to the issue of "blended differently" recordings is within the following response:

"Once the—And when we ended up going to trial on this, the State only proceeded to trial on attempted harassment of a witness. Once that happened, whether or not anything was actually communicated to Ms. Ware by Mr. Hamilton was irrelevant. The State had the audios, the overhear where clearly [defendant] and Mr. Hamilton were talking about trying to contact Ms. Ware. [Defendant] says, oh, no, we have to use code. Let's talk to JW. Honestly, not a very good code. JW, Jamie Ware.

The audio unfortunately spoke for themselves. So whether or not Mr. Hamilton ever contacted Ms. Ware is, at that point[,] completely irrelevant."

¶ 102    The *Krankel* inquiry was adequate to determine the factual basis for defendant's claim. The trial court heard defendant's allegation and learned defendant had no factual support for that assertion other than he participated in the conversation and heard the recordings. Moreover, the court was the same court in which the trial was held, at which the recordings were played and heard by the court. Hamilton also testified the recordings accurately represented his conversations with defendant. A direct response from counsel was unnecessary to the court's inquiry.

¶ 103    Defendant's second challenge to the adequacy of the trial court's *Krankel* inquiry relates to his claim counsel should have played for the jury a telephone call during which Hamilton told defendant that Ware told Hamilton she was being pressured by the State to testify. Defendant contends counsel did not disclose whether he listened to the call or explain his trial strategy for not introducing the call.

¶ 104    We disagree with defendant's contention counsel did not respond to this allegation. Defense counsel's response to the trial court's question included his conclusion, after the State dropped the harassment charge to attempted harassment, the issue of "whether or not Mr. Hamilton ever contacted Ms. Ware is, at that point[,] completely irrelevant." While he did not say he listened to the call, he provided an explanation for the exclusion of evidence related to conversations between Hamilton and Ware.

¶ 105    The trial court thus had gained the information necessary to learn the factual basis for defendant's claim. Defendant told the court his concerns at the *Krankel* inquiry. The court knew the facts of the case, including the elements of the charged offense and the witnesses who testified. No further information was needed for the trial court to find no merit to this ineffectiveness claim.

¶ 106                                   4. *Allegedly Improper* Krankel *Inquiry*

¶ 107          We note in each *Krankel*-based claim defendant asserts the trial court's inquiry was inadequate as the court repeatedly referenced an improper standard when ruling on his claims. Defendant emphasizes the court's references to defendant's failure to raise the issue in either of the three cases at any time before the end of trial. Defendant contends Illinois courts recognize the difficulty in resolving *Strickland* claims before the end of trial as the outcome has not been reached and it would be, therefore, impossible to decide the second *Strickland* prong. See *People v. Washington*, 2012 IL App (2d) 101287, ¶ 20, 970 N.E.2d 43.

¶ 108          As shown above, a *Krankel* inquiry is adequate when it is "sufficient to determine the factual basis of the claim." *Ayres*, 2017 IL 120071, ¶ 11 (quoting *Banks*, 237 Ill. at 213). The trial court's emphasis on defendant's failure to assert concerns about counsel's representation of him does not affect an adequacy-of-the-*Krankel*-inquiry determination when the process was sufficient to determine the factual basis of the defendant's claims. Here, the *Krankel* inquiry was adequate as the court had determined the factual bases of defendant's claims.

¶ 109                              C. Hearsay, Case No. 17-CF-107

¶ 110          Defendant next contends the trial court erroneously overruled counsel's hearsay objection to Officer Maier's testimony Ware approached him for "help" regarding defendant's phone calls with Hamilton. Defendant contends the testimony was inadmissible to explain Officer Maier's steps in the investigation as the court failed to assess the testimony to ensure it included no more than necessary to explain Officer Maier's conduct and the statement revealed information that was unnecessary and prejudicial. Defendant acknowledges his claim is forfeited as he failed to raise the matter in a written posttrial motion. Defendant urges this court, however, to review the matter as plain error.

¶ 111    At trial, the objection followed the State's question to Officer Maier after the State confirmed Officer Maier had spoken to Ware about the recordings of the telephone conversations:

> "[THE STATE]. She had come to you regarding help for what was happening?
>
> A. Correct.
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Hold on. What was the objection?
>
> [DEFENSE COUNSEL]: Hearsay regarding help.
>
> THE COURT: That's not a hearsay statement. Overruled."

¶ 112    The State maintains Officer Maier did not provide a statement by Ware.

¶ 113    Under the plain-error rule, a court of review may consider an otherwise forfeited argument under one of two scenarios:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 25 (quoting *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1058 (2010)).

To invoke the plain-error rule, defendant bears the burden of proving one of the above scenarios

applies. *Id.* Our first task in plain-error analysis is to determine whether a clear or obvious error occurred at trial. *People v. Sebby*, 2017 IL 119445, ¶ 49, 89 N.E.3d 675.

¶ 114 Evidence is hearsay when it is "an out-of-court statement offered to prove the truth of the matter asserted." *People v. Olinger*, 176 Ill. 2d 326, 357, 680 N.E.2d 321, 336 (1997). A statement can be an oral or written assertion or nonverbal conduct of a person if the conduct was intended as an assertion. *People v. Neal*, 2020 IL App (4th) 170869, ¶ 80, 150 N.E.3d 984. Hearsay evidence "is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule." *Olinger*, 176 Ill. 2d at 357.

¶ 115 Defendant has not met his burden of establishing a clear error occurred. In his opening brief, defendant developed no argument establishing Officer Maier's agreement Ware came to him for "help with what was happening" was a "statement" within the definition of hearsay. After the State asserted the challenged testimony was not a "statement," defendant asserted the following in his reply brief: "Maier's testimony that Jamie came to him for 'help' was a statement because she either told Maier she needed help, or her nonverbal conduct indicated to him that she needed help. [(Record citation omitted.)] Maier then impermissibly repeated Jamie's statement at trial, which made it an out-of-court statement." Defendant further highlighted the question regarding "help" followed the State's question of whether Officer Maier spoke to Ware about the recordings. The only citation to support the contention Officer Maier's answer is a "statement" is a citation to the definition of hearsay. Officer Maier did not provide the words Ware used and did not testify Ware asked or used the word "help." Defendant provides no legal support for the argument the admission of a reference to a situation, without revealing the words spoken, is clear error based on hearsay.

¶ 116 In sum, defendant has not established plain error. The procedural forfeiture stands

as a result.

¶ 117                                         III. CONCLUSION

¶ 118            For the reasons stated, we affirm the trial court's judgment.

¶ 119            Affirmed.