2025 IL App (4th) 241505-U

NO. 4-24-1505

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

FILED
December 18, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Sangamon County |
| MICHAEL R. WALKER, | ) | No. 15CF1062 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John M. Madonia, |
| | ) | Judge Presiding. |

_____

JUSTICE DeARMOND delivered the judgment of the court.
Justices Steigmann and Knecht concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The appellate court affirmed, finding postconviction counsel did not render
           unreasonable assistance.

¶ 2        In May 2018, a jury convicted defendant, Michael R. Walker, of two counts of

predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)) and two

counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(2)) (West 2014)). The trial

court sentenced defendant to an aggregate term of 30 years in the Illinois Department of

Corrections (DOC), followed by 3 years' mandatory supervised release (MSR). Defendant

appealed, and this court affirmed the convictions and sentences in *People v. Walker*, 2021 IL

App (4th) 190073, *reh'g denied* (Sept. 2, 2021), *pet. for leave to appeal denied*, 183 N.E.3d 891

(Table) (Nov. 24, 2021). Defendant filed a *pro se* postconviction petition in August 2022, which,

after 90 days, the trial court advanced to second-stage proceedings and appointed counsel. In

July 2024, postconviction counsel filed a second amended postconviction petition, along with a certificate of compliance with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). The State moved to dismiss the amended petition, which the court granted in a written order in September 2024. On appeal, defendant argues his postconviction counsel provided unreasonable assistance by failing to include in the amended petition defendant's *pro se* claims of prosecutorial misconduct. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          In October 2015, the State charged defendant with three counts of predatory criminal sexual assault of a child and two counts of aggravated criminal sexual abuse based on allegations from his then seven-year-old niece, S.W., that, from May to July 2015, he touched her vagina with his mouth and hand and she touched his penis. The matter culminated in a jury trial in May 2018, where the State dismissed one count of predatory criminal sexual assault of a child but proceeded on the remaining four counts.

¶ 5                                    A. Jury Trial

¶ 6          At trial, the State called seven witnesses, including the victim, S.W. The State's case centered upon S.W.'s disclosure to her mother of defendant's acts and what occurred after those revelations. The State called S.W.'s mother and father, who described how they learned of the abuse and their immediate responses. It called Sangamon County Sheriff's Office Deputies Brian Fleck and Michael Harth, who testified about their investigation into S.W.'s allegations. It called Dr. Careyana Brenham, who conducted a child sexual abuse examination on S.W. on August 20, 2015. The State's final witness was Lindsey Reichert, the forensic interviewer, who conducted an interview with S.W. at the Sangamon County Child Advocacy Center on August 4, 2015. The State also played the video recording of Reichert's interview with S.W.

¶ 7        Relevant here is testimony from S.W.'s father, and defendant's brother, Jonathan Walker. He testified he learned of S.W.'s allegations when her mother, Rebecca W., called to tell him. Jonathan then informed their father of the allegations. While they were talking outside the house, defendant approached them. When Jonathan confronted defendant with S.W.'s allegations, defendant initially "tried to deny it" and "acted shocked." Jonathan persisted, noting he "suggest[ed] some form of treatment or help for [defendant]." He urged defendant, " 'Admit it and we'll try to find you help, yes or no.' " Defendant answered, " 'Yes.' " On direct examination, the State asked, "Did your father drive your brother [(defendant)] the next day to try and get some help, yes or no, take him to Bloomington?" Jonathan answered, "Yes."

¶ 8        On cross-examination, counsel picked up on that line of questioning, asking, "Now, let's talk about the treatment that you felt he needed. You're a glass blower, right?" Jonathan answered, "Yes." Counsel clarified, "You are not a psychiatrist, are you?" Jonathan answered, "No." Jonathan also testified he initially did not know where defendant went when he left the farmhouse for good. He testified he eventually learned defendant went to Edwardsville, Illinois, to begin his master's degree program. Finally, counsel questioned Jonathan about inconsistencies between his current testimony and statements he made to Deputies Fleck and Harth.

¶ 9        Also relevant to this appeal is Dr. Brenham's testimony about her examination of S.W. She testified the exam yielded normal results, noting S.W.'s hymen appeared normal, there were no signs of bruising, lacerations, or tears, there was no notching or separation of the hymen, and S.W.'s anal area looked normal. Dr. Brenham explained, "[T]he majority of children that are seen for sexual abuse have normal findings," even "anywhere from 80 to 95, 97 percent of children that are sexually abused have normal findings." She asserted, "[T]hat can be explained

because most children don't disclose sexual abuse until after it has occurred," and "the genital area mucosal tissue," like "the tissue on the inside of your mouth," often "heals within 24 to 48 hours."

¶ 10 On cross-examination, defense counsel had Dr. Brenham confirm her examination of S.W. yielded "no physical findings of trauma." She testified S.W. had no bruising, lacerations, or abrasions in her "genital area" and the hymen specifically.

¶ 11 During its closing argument, the State reviewed the evidence and emphasized defendant's confession to Jonathan, saying:

"We heard about the confrontation, the conversation between John, the Defendant, and his father who was also present. John told you he confronted his brother. He asked him if he did this. His brother said yes. He agreed with John that he needed treatment. He traveled to Bloomington to seek help. He packed his bags, and he left the family farm. He agreed with John he needed treatment. People don't need treatment unless they have a problem, unless they need to find a way to stop their behaviors."

The State then recounted Dr. Brenham's testimony, reiterating it was typical for child sexual abuse examinations to yield normal physical findings. The State noted those examinations are "not just about the physical findings," but they are "about a patient's history." The State stressed that S.W. consistently recounted defendant's abuse when she spoke with Dr. Brenham, Reichert, and her mother and when she testified in court.

¶ 12 Defense counsel's closing argument centered on S.W.'s "story" and how no witness could corroborate it but could only repeat it. In so doing, counsel said his "role *** as

[defendant's] advocate" was "to test the State's theory." He highlighted inconsistencies in S.W.'s testimony, the other witnesses' testimony, and the other evidence. Counsel took sharp aim at the sheriff's deputies' investigation and questioned their "adoption of [S.W.'s] story." He defended his tough questioning by saying "I have a job to do ***. I'm an advocate for the accused person." Counsel concluded his closing argument by pointing to the lack of direct physical or scientific evidence to corroborate the State's case. Noting Dr. Brenham's unremarkable findings on the forensic examination, counsel argued "there wasn't a shred of evidence that *** corroborated [S.W.'s] story," and "the only scientific direct evidence *** corroborates the presumption of innocence." Before sitting down, counsel cautioned the jury that the State would "make excuses as to why they don't have a shred of evidence that corroborates this story," and he urged the jury to demand proof, "[n]o excuses."

¶ 13      On rebuttal, the State argued it offered no excuses, only evidence—testimony from several witnesses. The State countered counsel's argument by noting the consistencies in the evidence. It responded to defense counsel's attack on the physical evidence, saying:

> "Dr. Brenham's examination, no signs of abuse. We ***
> heard a litany of suggestions as to what-ifs and what would have
> happened? What did Dr. Brenham ultimately tell us? Eighty
> percent of exams there is no physical finding, 80 percent. This is
> argument. This is what [defense counsel] does. He takes things and
> puts them into whatever he can twist. That's his job."

Counsel objected, but the court overruled it. The State continued, reiterating, "Eighty percent. According to Dr. Brenham, less than a coin flip whether *** there would be showing." The State argued it met its burden and asked the jury for guilty verdicts.

¶ 14          After 65 minutes of deliberation, the jury found defendant guilty on all counts. The trial court ordered a presentence investigation report and scheduled a sentencing hearing for November 2018.

¶ 15                              B. Postverdict

¶ 16          Meanwhile, defendant attempted to proceed *pro se*, filing various motions and arguing his trial counsel was ineffective. The trial court held a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), to inquire into defendant's claims of counsel's alleged ineffectiveness. Rejecting defendant's claims, the court ultimately found "a *bona fide* claim in this matter against [defense counsel] for ineffective assistance of counsel does not exist at the present time." Defendant opted to proceed *pro se*, and trial counsel withdrew from the case. Defendant then filed many frivolous *pro se* motions, including several motions for substituting the trial judge for cause and motions to vacate all void orders—all of which were denied. Defendant attempted to appeal those denials and was thwarted by the final judgment rule. See *People v. Smith*, 338 Ill. App. 3d 254, 256 (2003) ("Generally, *** appellate courts do not have jurisdiction to review judgments, orders, or decrees that are not final."); *People v. Abdullah*, 2019 IL 123492, ¶ 19 (stating that in a criminal case, the sentence is the final judgment).

¶ 17          Even up to the sentencing hearing, defendant kept filing *pro se* motions to delay the case, which the trial court heard and denied. The court eventually proceeded to sentencing over defendant's objection. After hearing victim impact statements and argument, the court sentenced defendant to consecutive 15-year terms in DOC, followed by 3 years' MSR, on the predatory criminal sexual assault of a child counts and concurrent 5-year terms in DOC, followed by 2 years' MSR, on the aggravated criminal sexual abuse counts. Defendant filed motions to reduce his sentence and for appointment of counsel. The court appointed counsel,

- 6 -

who filed a motion to reconsider the sentence, which the court denied, and defendant appealed.

¶ 18 On direct appeal, defendant challenged his convictions and sentence on three grounds: (1) the trial court erred by allowing inadmissible testimony from S.W.'s father and law enforcement; (2) the trial court failed to properly admonish prospective jurors under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012)); and (3) the 30-year prison sentence was excessive because the court placed too much emphasis on deterrence, failed to see defendant's potential for rehabilitation, and punished defendant for exercising his right to trial. This court considered all three arguments, reviewing the first two for plain error, and affirmed defendant's convictions and sentence. *People v. Walker*, 2021 IL App (4th) 190073.

¶ 19 C. Postconviction Proceedings

¶ 20 In August 2022, defendant filed a *pro se* postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). The petition alleged defendant received ineffective assistance from trial and appellate counsel and was denied due process through misconduct by the prosecution and the trial court. The petition detailed 87 purported trial errors reaching a constitutional magnitude. The court took no action on the petition and advanced it to second-stage proceedings after 90 days. The court then appointed postconviction counsel, who filed an amended petition in April 2024. The amended petition condensed defendant's 87 claims into 3 arguments: (1) trial counsel rendered ineffective assistance by failing to cross-examine S.W., failing to have hearsay statements excluded, and failing to exclude references to uncharged acts; (2) appellate counsel provided ineffective assistance by failing to raise ineffective assistance of trial counsel on direct appeal; and (3) the State's admission of evidence of uncharged acts and bolstering S.W.'s testimony violated due process. The State moved to dismiss the amended petition, and in July 2024, postconviction

counsel countered by filing a second amended petition, alleging the same three arguments and responding to the State's arguments for dismissal. He also filed a certificate of compliance with Rule 651(c) During the hearing, postconviction counsel reaffirmed his compliance with Rule 651(c), saying, "Any non-frivolous arguments that I could advance, I have." After the hearing, the court dismissed the second amended petition in a written order.

¶ 21        This appeal followed.

¶ 22                                    II. ANALYSIS

¶ 23        On appeal, defendant argues his postconviction counsel provided unreasonable assistance by failing to include his claims of prosecutorial misconduct, specifically, that the State knowingly elicited perjured testimony and referenced said testimony in its closing argument, where the State also vilified defense counsel. Because we agree with postconviction counsel that these claims were frivolous, we affirm.

¶ 24        "The Act provides a three-stage process for the adjudication of postconviction petitions." *People v. Buffer*, 2019 IL 122327, ¶ 45. Once a postconviction petition moves from the first to the second stage, the trial court may appoint counsel to represent the defendant, and the State may file responsive pleadings. *People v. House*, 2021 IL 125124, ¶ 17. During the second stage, the court determines "whether the postconviction petition and any accompanying documentation make a substantial showing of a constitutional violation." *House*, 2021 IL 125124, ¶ 17. "[T]he allegations in the petition must be supported by the record in the case or by its accompanying affidavits." *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). A petition's allegations fail to clear the substantial-showing hurdle when they "are contradicted by the record from the original trial proceedings." *Coleman*, 183 Ill. 2d at 382. If a defendant fails to make a substantial showing of a constitutional violation, his postconviction claims are subject to

dismissal. *House*, 2021 IL 125124, ¶ 17. The court's dismissal of a defendant's claims at the second stage of proceedings is subject to *de novo* review. *People v. Johnson*, 2017 IL 120310, ¶ 14.

¶ 25          In postconviction proceedings, there is no constitutional right to counsel; rather, the right is supplied by statute. *People v. Addison*, 2023 IL 127119, ¶ 19. A defendant is entitled to a "reasonable level of assistance," which is less than what is afforded by the federal and state constitutions. (Internal quotation marks omitted.) *Addison*, 2023 IL 127119, ¶ 19. The distinction comes from the fact that postconviction counsel is appointed to shape a defendant's complaints into proper legal form and present them, not protect a defendant "from the prosecutorial forces of the State." *Addison*, 2023 IL 127119, ¶ 19.

¶ 26          Rule 651(c) ensures defendants receive reasonable assistance from postconviction counsel. *Addison*, 2023 IL 127119, ¶ 20. Rule 651(c) requires postconviction counsel to (1) consult with the defendant to ascertain his contentions, (2) examine the record of the trial proceedings, and (3) make "any amendments to the petition filed *pro se* that are necessary for an adequate presentation of [the defendant's] contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017). "Compliance with the rule is mandatory [citation], but once postconviction counsel files a Rule 651(c) certificate, a rebuttable presumption of reasonable assistance arises." *Addison*, 2023 IL 127119, ¶ 21. This means "[t]he defendant bears the burden of overcoming that presumption by showing that postconviction counsel did not substantially comply with the strictures of the rule." *Addison*, 2023 IL 127119, ¶ 21.

¶ 27          Defendant here does not contend postconviction counsel failed to consult with him or failed to examine the record. He challenges counsel's compliance with Rule 651(c)'s third requirement to make any necessary amendments to the petition. Specifically, defendant

argues postconviction counsel provided unreasonable assistance by failing to adequately present his two prosecutorial misconduct claims in compliance with Rule 651(c).

¶ 28    We pause to note that Rule 651(c)(3) does not say postconviction "*must* amend a petitioner's *pro se* postconviction petition." (Emphasis added.) *People v. Turner*, 187 Ill. 2d 406, 412 (1999). Rather, counsel need only make the *necessary* amendments to put the *pro se* claims in proper legal form to avoid procedural bars. *Addison*, 2023 IL 127119, ¶ 21. Counsel's obligations under Rule 651(c)(3) "do not include bolstering every claim presented in a petitioner's *pro se* conviction petition, regardless of its legal merit, or presenting each and every witness or shred of evidence the petitioner believes could potentially support his position." *People v. Custer*, 2019 IL 123339, ¶ 38.

¶ 29    Believing his *pro se* claims of prosecutorial misconduct already made a substantial showing of a constitutional violation, defendant maintains they were necessary amendments that postconviction counsel unreasonably omitted from the second amended postconviction petition. Because postconviction counsel filed a Rule 651(c) certificate, we begin with the presumption of reasonable assistance, which defendant must rebut. Defendant identifies two specific *pro se* claims, and we take each claim in turn.

¶ 30                          A. Claim V

¶ 31    Claim V of defendant's *pro se* petition alleged, "The State used [defendant's] retention of counsel to imply guilt while it simultaneously committed fraud." In a nutshell, defendant believes the State knowingly elicited and then highlighted testimony that defendant went to Bloomington, Illinois, to get psychiatric treatment when it knew he went to retain an attorney. Defendant believes the State falsely substituted his alleged fictitious treatment to imply he was guilty during closing argument since it could not reference his retention of legal counsel.

A clear-eyed reading of the record, however, shows no fraud by the State and totally refutes defendant's argument.

¶ 32    Defendant's claim finds its origins in Jonathan's testimony about his confrontation with defendant outside the family's farmhouse. Jonathan pressed his brother to confess that he abused S.W., saying, " 'Admit it and we'll try to find you some help, yes or no.' " Defendant answered, " '[Y]es.' " Jonathan then confirmed that their father took defendant to Bloomington the next day to "get some help." The State introduced "treatment" into the questioning about the confrontation by unartfully asking Jonathan, "Okay, did you suggest some form of treatment or help for your brother?" Jonathan answered, "Yeah." Notably, it was defendant's trial counsel who introduced the idea of *psychiatric treatment* into the record by saying to Jonathan, "Now, let's talk about the treatment that you felt he needed." He then confirmed Jonathan was a glass blower and not a psychiatrist. Once defense counsel opened the door to psychiatric treatment, the State walked through it during closing arguments by highlighting that defendant "agreed with John that he needed treatment" and "traveled to Bloomington to seek help." The State reasoned, "People don't need treatment unless they have a problem, unless they need help with something, unless they need to find a way to stop their behaviors."

¶ 33    We see nothing improper here. "A prosecutor has wide latitude in making a closing argument and is permitted to comment on the evidence and any fair, reasonable inferences it yields." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). When considering potential prosecutorial misconduct, we take a broad view. "A closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context." *Glasper*, 234 Ill. 2d at 204. One can reasonably infer from Jonathan's testimony, especially on cross-examination, that

defendant agreed he needed psychiatric treatment when he admitted he abused S.W. Further, one could reasonably infer that was the "help" he sought in Bloomington.

¶ 34            Defendant likens this case to *People v. Olinger*, 176 Ill. 2d 326 (1997), where the State knowingly elicited false testimony from a witness and then failed to correct it. There, a State's witness falsely testified he received immunity for one crime in one criminal case in exchange for his testimony. *Olinger*, 176 Ill. 2d at 340. In postconviction proceedings, the defendant submitted affidavits from his attorneys, who recounted the witness actually received immunity for multiple crimes in multiple jurisdictions for his testimony. *Olinger*, 176 Ill. 2d at 342. The affidavit further averred the State knew of and helped broker the deal for immunity. *Olinger*, 176 Ill. 2d at 342-44. Our supreme court determined the defendant was entitled to a third-stage evidentiary hearing because he made a substantial showing the State knew the full details of the witness's deal but allowed the false testimony to go uncorrected. *Olinger*, 176 Ill. 2d at 345, 347. The present case before us is distinguishable from *Olinger*.

¶ 35            Defendant points to police reports to argue the State knew he did not go to Bloomington to seek psychiatric treatment. The police reports, like the trial evidence, are based largely upon Jonathan's point of view, and he equivocated on the reason for defendant's trip. Deputy Fleck's report (dated 7/31/2015) noted Jonathan said defendant went to Bloomington "to speak to an attorney." Detective Harth's first report (dated 8/3/2015) recounted that Jonathan told him defendant went to Bloomington, "where [he] met with an Attorney." But Detective Harth's next report (dated 8/5/2015) included Jonathan's account that he and his father discussed "seek[ing] psychological help for [defendant]." Jonathan told Harth he "initially wanted to have [defendant] seek inpatient treatment." Contrary to defendant's claim, and unlike the *Olinger* affidavits, these reports do not show the State committed fraud or knowingly elicited false

testimony.

¶ 36    The State's purpose for Jonthan's testimony was to get defendant's confession before the jury. Obviously, the State understood any comment regarding seeking counsel would have been fraught with peril. The record shows the State drew out defendant's admission to Jonathan once Jonathan assured him that he could "get some help." It never referenced defendant retaining an attorney. Exercising appropriate caution, the State kept the reason for defendant's Bloomington trip generic, saying it was for "treatment or help." It was the defense who injected "psychiatric treatment" into evidence, and the defense was equally aware of the two reasons given for the trip to Bloomington. Having chosen to create the appearance in the minds of jurors it was for psychiatric help, defense counsel opened the door for comment by the State. Considering the conflicting reasons given for the trip, it was reasonable for the State to comment on the one put forth by defense counsel. Further, there is no indication Jonathan committed perjury or failed to give a full account of his confrontation with defendant. He testified to what he said and thought. He said "help," not "treatment." He knew defendant went to Bloomington, but he did not know what happened there or afterward. He knew defendant left the farm and did not know until later that defendant went to Edwardsville, Illinois, for graduate school. Neither the record nor the police reports defendant submitted with his *pro se* petition show the State elicited perjured testimony or committed fraud or failed to correct false testimony, making this case unlike *Olinger*. Since the trial record refutes defendant's claim, there could not be a substantial showing of a constitutional violation (see *Coleman*, 183 Ill. 2d at 382), which renders this claim frivolous.

¶ 37                                B. Claim XV

¶ 38    Claim XV of defendant's *pro se* petition alleged, "The State's vilification of trial

- 13 -

counsel during closing argument created unfair prejudice." He points to the State's rebuttal closing argument, wherein the State addressed defense counsel's argument that the prosecution provided no direct physical evidence to show defendant's guilt. Defendant believes the State's argument amounted to prosecutorial misconduct and a due process violation because the argument attacked defense counsel's integrity and served only to inflame the jury. We disagree.

¶ 39        Defendant latches onto the State's assertion that, "This is argument. This is what [defense counsel] does. He takes things and puts them into whatever he can twist. That's his job." Defendant conveniently omits that the State was responding to a specific argument from the defense. In his closing argument, defense counsel took aim at the State's case, specifically, the lack of physical evidence or scientific evidence indicating defendant's guilt. Counsel described his job as testing the State's case, and he argued that "there wasn't a shred of evidence that *** corroborate[d] S.W.'s story," disregarding the multiple and consistent corroborative complaint witnesses, and "the only scientific direct evidence," namely, Dr. Brenham's forensic exam, "corroborates the presumption of innocence." This was the context for the State's comments during its rebuttal argument. The State was responding to defense counsel's attack on Dr. Brenham's report, specifically, that her examination of S.W. revealed no physical findings of abuse. Counsel argued that zero physical findings from a forensic exam indicate no crime occurred, when, in fact, Dr. Brenham testified 80% of forensic exams of children yield no physical findings.

¶ 40        Perhaps the State should have used a different word than "twist," but it was making the point that defense counsel was framing facts supportive of the State's case with an obvious bent toward the defense. This was not misconduct. The defense can comment on the evidence, and the State can respond. The State was reminding the jury the very same evidence

- 14 -

supported a conviction. The law allows such a response. "Statements will not be held improper if they were provoked or invited by the defense counsel's argument." *Glasper*, 234 Ill. 2d at 204. The same principle also covers the State's retort that defense counsel's "job" is to present facts favorably for his client. Defense counsel talked about his "job" being to test the State's theory and to vigorously question Detective Harth and Deputy Fleck about their investigation into S.W.'s claims. Defense counsel cannot tout his "job" and the benefits it brings our justice system and then recoil when the State counters the argument. Defense counsel invited the State's response. Looking at the entire closing arguments, considering the comments in context (see *Glasper*, 234 Ill. 2d at 204), we see no prosecutorial misconduct here. There certainly was no "vilification" of defense counsel.

¶ 41 Defendant directs our attention to several cases where reviewing courts found the State committed misconduct by disparaging the defense collectively or counsel individually. See *People v. Starks*, 116 Ill. App. 3d 384, 394 (1983) (finding prosecutorial misconduct where the State invoked terms of " 'hoodwinked,' " " 'fooled,' " " 'pack of lies,' " and " 'ridiculous double talk' " when talking about the defense and counsel); *People v. Kidd*, 147 Ill. 2d 510, 542-44 (1992) (finding misconduct when the State repeatedly referred to defense counsel's " 'smoke screen,' " distinguishing it from cases where "only a passing reference to a 'smoke screen' " was not error); *People v. Emerson*, 97 Ill. 2d 487, 497-98 (1983) (finding prosecutorial misconduct when the State claimed the defense relied on " 'lies and misrepresentations and innuendoes,' " tried to " 'dirty up the victim,' " and had to ' 'make something up' "); *People v. Suggs*, 50 Ill. App. 3d 778, 783 (1977) (finding prosecutorial misconduct when the State made repeated verbal attacks on defense counsel, accusing her of lying, unprofessional conduct, and " 'dirty tricks' "); *People v. Weathers*, 62 Ill. 2d 114, 118-19 (1975) (finding prosecutorial misconduct when the

State made five grossly improper remarks, including accusing defense counsel of lying and sowing confusion); *People v. Beringer*, 156 Ill. App. 3d 309, 314-15 (1987) (finding reversible error when "the record is replete with accusations and innuendo implying that defense counsel resorted to lying, trickery and deception").

¶ 42　　　None of those cases compare to the one before us. Here, there was no single disparagement, let alone repeated attacks on counsel's integrity. The State resisted hyperbole and name-calling. It did not claim defense counsel lied, sowed confusion, or resorted to trickery. The State merely used its last opportunity to talk to the jury to respond to the opponent's closing argument. "Statements will not be held improper if they were provoked or invited by the defense counsel's argument." *Glasper*, 234 Ill. 2d at 204. The State's comments in rebuttal here are not comparable to the pervasive prejudicial comments found in the above cited cases. See, *e.g.*, *People v. Sharp*, 391 Ill. App. 3d 947, 958 (2009) (declining to review a prosecutorial misconduct claim for plain error because "the prosecutor's allegedly improper comments were not overly extensive"). Calling the State's response "vilification" is the only hyperbole we find here. See *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 47 (noting prosecutors are afforded wide latitude during closing argument and may respond to comments made by defense counsel that invite a response).

¶ 43　　　Because there was neither prosecutorial misconduct nor a due process violation here, we share postconviction counsel's characterization of claims V and XV as frivolous. Counsel rightly omitted them from the second amended petition. Postconviction counsel's duties under Rule 651(c) "do not include bolstering every claim presented in a petitioner's *pro se* postconviction petition, regardless of its legal merit, or presenting each and every witness or shred of evidence that [defendant] believes could potentially support his position." *Custer*, 2019

IL 123339, ¶ 38. Despite defendant's argument to the contrary, he received reasonable assistance from postconviction counsel. Counsel put defendant's *pro se* claims in proper form, framing them as ineffective assistance of trial and appellate counsel and then a due process violation. Postconviction counsel's decision to omit a weaker, frivolous argument was not unreasonable. A petition's allegations fail to clear the substantial-showing hurdle when they "are contradicted by the record from the original trial proceedings." *Coleman*, 183 Ill. 2d at 382. Consequently, defendant failed to rebut the presumption he received reasonable assistance created by counsel filing the Rule 651(c) certificate.

¶ 44                                III. CONCLUSION

¶ 45          For the reasons stated, we affirm the judgment of the trial court.

¶ 46          Affirmed.